Kirk A. Pasich (State Bar No. 94242)
pasichk@dicksteinshapiro.com
Susan Page White (State Bar No. 137125)
whites@dicksteinshapiro.com
DICKSTEIN SHAPIRO LLP
2049 Century Park East, Suite 700
Los Angeles, CA 90067
Telephone:  (310) 772-8300
Facsimile:  (310) 772-8301

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND MANZAREK, an individual; and DOORS TOURING, INC., a California corporation,<br><br>            Plaintiffs,<br><br>      v.<br><br>ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a Minnesota corporation; and DOES 1 through 10,<br><br>            Defendants. | CASE NO.: CV-06-2082-R<br><br>**SECOND AMENDED COMPLAINT FOR BREACH OF CONTRACT, TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH, AND DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Raymond Manzarek and Doors Touring, Inc. allege as follows:

## NATURE OF THIS ACTION AND RELIEF SOUGHT

1.      This action arises out of insurance issues raised by litigation between founding members of the legendary rock group The Doors.  John Densmore, the drummer, sued Raymond Manzarek, the keyboard player, and Doors Touring, Inc., a company formed in 2002 in connection with performances by Manzarek and Robbie Krieger, another original member of the Doors, in *Densmore v. Manzarek*, Los Angeles Superior Court, Case No. BC289730 (the "*Densmore* lawsuit").  In addition, the estate of Jim Morrison, the former vocalist for *The Doors*, and the estate of his wife, Pamela Courson, sued Manzarek in *Courson v. Manzarek*, Los Angeles Superior

1    Court, Case No. BC294495 (the "*Courson* lawsuit"). Each estate allegedly owns a

2    50% interest in the 25% partnership interest of the Doors Partnership that was owned

3    by Mr. Morrison prior to his death.

4          2.     The *Densmore* lawsuit sought damages from Manzarek and Doors

5    Touring for the unauthorized use of name, trade name, logo and trademark of *The*

6    *Doors* in conjunction with their planned national and international tours. Densmore

7    alleged, among other things, that Manzarek and Doors Touring wrongfully advertised

8    personal appearances as *The Doors* and made public appearances as *The Doors*.

9    Densmore also alleged that Manzarek and Doors Touring improperly used *The Doors*

10    logo in connection with the marketing of products and merchandise. Densmore

11    alleged that this purported wrongful conduct minimized and diminished his reputation

12    and stature by causing people to believe that he was not, and is not, an integral and

13    respected part of *The Doors*, or is one member who is easily replaced by another.

14          3.     The *Courson* lawsuit similarly alleged that Manzarek committed offenses

15    in connection with misappropriating and infringing upon the valuable name and logo

16    of *The Doors*, along with the poetry, photographs and likeness of Jim Morrison. The

17    *Courson* plaintiffs alleged that Manzarek and the other defendants improperly used

18    the name and logo of *The Doors* for the purpose of promoting and marketing a new

19    band with two other individuals that were not associated with the original Doors band,

20    intending to embark on a national and international tour to wrongfully enrich

21    themselves. The *Courson* plaintiffs alleged that Manzarek and the other defendants

22    wrongfully misappropriated the name and logo of *The Doors* in a scheme to market

23    and promote this new band and to confuse the public into believing that the new band

24    is somehow associated with the original Doors. The *Courson* plaintiffs also alleged

25    that Manzarek and the other defendants have used *The Doors* website for advertising

26    and promoting the defendants' new band, their concerts and other products, all

27    without the *Courson* plaintiffs' permission.

28

4.     Manzarek and Doors Touring provided timely notice of the Densmore and *Courson* lawsuits to St. Paul Fire and Marine Insurance Company, an insurer which sold Manzarek and Doors Touring commercial general liability ("CGL") policies for substantial premium dollars.  These CGL policies insured and protected Manzarek and Doors Touring against, among other things, various types of advertising injury claims and imposed numerous obligations on St. Paul with respect to such claims.  Nevertheless, despite the policy terms and conditions and the requirements of applicable law, St. Paul denied coverage and refused to honor any of its duties on behalf of Manzarek and Doors Touring in connection with the *Densmore* and *Courson* lawsuits.  Therefore, Manzarek and Doors Touring have brought this action against St. Paul for breach of contract, tortious breach of the covenant of good faith and fair dealing, and declaratory relief.

5.     St. Paul's refusal and failure to defend and/or pay defense costs to Manzarek and Doors Touring constitute breaches of the policies.  Manzarek and Doors Touring seek compensatory damages resulting from St. Paul's breaches, including a breach of St. Paul's obligations to pay in full all attorneys' fees and costs that Manzarek and Doors Touring have incurred, or will incur, in the defense of the *Densmore* and *Courson* lawsuits, plus interest.  These fees and costs currently exceed $3,800,000.

6.     Manzarek and Doors Touring also seek punitive damages and attorneys' fees resulting from St. Paul's tortious breach of the implied covenant of good faith and fair dealing.  St. Paul acted in bad faith by, among other things: (a) refusing and failing to defend and/or reimburse Manzarek and Doors Touring for the attorneys' fees and costs that they have incurred to defend the *Densmore* and *Courson* lawsuits; (b) failing to conduct a full and thorough investigation of the *Densmore* and *Courson* lawsuits, and asserting grounds for denying coverage based on its inadequate investigation; (c) asserting grounds for denying coverage that it knows are not supported by, and in fact are contrary to, the terms of the Policies, the law, insurance

industry custom and practice, and the facts; (d) failing to fully inquire into possible bases that might support coverage for the *Densmore* and *Courson* lawsuits; (e) failing to honor its promises and representations in its Policies that it would defend its insureds in suits alleging damages that the insureds are legally obligated to pay, for "advertising injury" and "bodily injury;" (f) wrongfully denying coverage and thereby depriving Manzarek and Doors Touring of the financial resources that would have enabled them to settle the *Densmore* and *Courson* lawsuits, which would have resulted in them avoiding the adverse judgments against them in the *Densmore* and *Courson* lawsuits; and (g) by giving greater consideration to its own interests than it gave to the interests of Manzarek and Doors Touring.

7.     Manzarek also seeks a judicial declaration with respect to St. Paul's duty to indemnify for the *Densmore* and *Courson* lawsuits, including, a declaration that St. Paul is obligated under the Policies to indemnify Manzarek in full for all sums that he may be required to pay in connection with any final judgment or any other resolution of the *Densmore* and *Courson* lawsuits.

## THE PARTIES

8.     Manzarek was at all relevant times a citizen of California.

9.     Doors Touring is a California corporation.  Doors Touring is authorized to transact, and is transacting business, in the State of California and the County of Los Angeles.

10.     Manzarek and Doors Touring are informed and believe, and on that basis allege, that St. Paul is a Minnesota corporation authorized to transact, and transacting, business in the State of California and the County of Los Angeles.

11.     Manzarek and Doors Touring are ignorant of the true names and capacities, whether individual, associate, partnership, corporate, or otherwise, of the defendants fictitiously designated herein as Does 1 through 10, and therefore sue those defendants by these fictitious names.  Manzarek and Doors Touring will seek leave of Court to amend this complaint when the true names and capacities of these fictitiously

4

1   designated defendants have been ascertained.  Manzarek and Doors Touring are

2   informed and believe, and on that basis allege, that Does 1 through 10, in some way

3   unknown to Manzarek and Doors Touring, have underwritten or provided insurance

4   coverage to them, or are otherwise responsible for losses alleged herein, and that Does

5   1 through 10 are authorized to, and do, transact insurance business in the State of

6   California and the County of Los Angeles.

## THE INSURANCE POLICIES

8       12.    From at least May 24, 2002, to May 24, 2003, St. Paul insured Manzarek

9   under CGL policy no. CK04506093 (the "Manzarek Policy").  And, from at least

10  December 30, 2002, to December 30, 2003, St. Paul insured Manzarek and Doors

11  Touring under CGL policy no. CK04507072 (the "Doors Touring Policy")

12  (collectively, the "Policies").  The Policies provide coverage for, among other things,

13  advertising injury liability.  The Policies each provide $1,000,000 in coverage for

14  "advertising injury," and obligate St. Paul to defend its insureds against potentially

15  covered claims, with the fees and expenses of the defense to be paid in addition to

16  each of the policy's limits.  The Policies also provide $1,000,000 in "general"

17  coverage, which is the general liability coverage for "bodily injury and property

18  damage liability."  There are no deductibles for the "advertising injury" or "bodily

19  injury and property damage liability" coverage sections of the Policies.  True and

20  correct copies of at least the relevant portions of the Policies are attached hereto as

21  Exhibits A & B and incorporated herein by reference.

22      13.    At the time it sold the Policies, St. Paul knew that Manzarek and Doors

23  Touring were in the entertainment business.  Indeed, it described in the Policies the

24  "Business of Insured" as "ENTERTAINER," used the "class code" of

25  "PREMISES/OPERATIONS ENTERTAINERS/PERFORMERS PER EVENT," and

26  used a rate to calculate premiums that it said "applies per: ENTERTAINER" or

27  "TRAVELING ENTERTAINER"  Ex. A at 9 & Ex. B at 13, Commercial General

28  Liability Protection Estimated Premium Summary  Thus, St. Paul knew that it was

DOCSLA-32234v03

selling liability policies to insureds that represented on their face that they were covering, among other things, claims and lawsuits alleging "advertising injury" or "bodily injury" relating to its insureds' business in the field of entertainment.

14.    The Manzarek Policy was effective beginning on May 24, 2002. However St. Paul did not deliver the policy to its insured until at least October 3, 2002.  Moreover, St. Paul did not deliver the Manzarek Policy to the insureds until sometime after it was issued.

15.    Similarly, while the Doors Touring Policy was effective beginning on December 30, 2002, St. Paul did not issue the policy to its insureds until at least February 19, 2003.  And, St. Paul did not deliver the Doors Touring Policy to its insureds until sometime after February 28, 2003.

16.    Pursuant to the "advertising injury" provision contained in the Policies, St. Paul is obligated to

>    pay amounts any protected person is legally required to pay
>    as damages for covered advertising injury that:
>    • results from the advertising of your products, your work,
>      or your completed work; and
>    • is caused by an advertising injury offense committed
>      while this agreement is in effect.

Policies, p. 4, Advertising Injury Liability.

17.    "Advertising injury" is defined in the Policies to mean "injury, other than bodily injury or personal injury, that's caused by an advertising injury offense." *Id.*, Advertising Injury.

18.    The Policies define "advertising injury offense" as any of the following offenses:

>    • Libel, or slander, in or with covered material.

DOCSLA-32234v03

- Making known to any person or organization covered material that disparages the business, premises, products, services, work, or completed work of others.
- Making known to any person or organization covered material that violates a person's right of privacy.
- Unauthorized use of any advertising idea or advertising material, or any slogan or title, of others in your advertising.

*Id.*, Advertising Injury Offense.

19.   "Advertising idea" means "a manner or style of advertising that others use and intend to attract attention in their advertising." *Id.*, Advertising Idea.

20.   "Advertising material" is defined to mean any covered material that:

- is subject to copyright law; and
- others use and intend to attract attention in their advertising.

*Id.*, Advertising Material.

21.   "Advertising" is defined in the Policies to mean: attracting the attention of others by any means for the purpose of:

- seeking customers or supporters; or
- increasing sales or business.

*Id.*, Advertising.

22.   The Policies also state that St. Paul has the right and duty to defend any protected person against a claim or suit for injury or damage covered by this agreement.  [St. Paul has] such right and duty even if all of

DOCSLA-32234v03

the allegations of the claim or suit are groundless, false, or
fraudulent.  But we won't have a duty to perform any other
act or service.

*Id.* at 4-5, Right and Duty to Defend a Protected Person.

23.    Each of the Policies expressly represented the insured against
"Advertising Injury liability." *Id.* at 4.  Indeed, St. Paul expressly stated in each
policy: "We'll pay amounts any protected person is legally required to pay as
damages for covered advertising injury . . . ." *Id.*

24.    The Policies also contain a Field of Entertainment Limitation
Endorsement (the "FEL Endorsement").  Rather than being conspicuous, plain, and
clear as the law requires, this endorsement was buried at least 46 pages into each of
the policies.  Furthermore, the endorsement purported to gut and render illusory
substantial portions of the $1,000,000 in "advertising injury" coverage that each
Policy otherwise prominently represented, including on the Declarations page.  The
FEL Endorsement provides, in pertinent part, that:

> **Field of Entertainment**.  We won't cover personal injury or
> advertising injury that results from the content of, or the
> advertising or publicizing for, any Properties or Programs
> which are within your Field of Entertainment Business.
> We explain what we mean by personal injury and
> advertising injury in the What This Agreement Covers
> section.
>
> *Properties or Programs* means any of your properties,
> products, programs, materials or other matter.
>
> *Field of Entertainment Business* includes the following:
>
> - The creation, production, publication, distribution,
>   exploitation, exhibition, advertising and publicizing of
>   product or material in any and all media such as

8

DOCSLA-32234v03

motion pictures of any kind and character, television
programs, commercials or industrial or educational or
training films, phonograph records, audio or video
tapes, CDs or CD ROMs, computer on-line services
or internet or Web site pages, cassettes or discs,
electrical transcriptions, music in sheet or other form,
live performance, books and other publications.

- The ownership, operation, maintenance or use of radio
and television broadcasting stations, CATV systems,
cinemas, stage productions with living actors, and any
similar exhibition or broadcast media.

- The ownership, operation, maintenance or use of
merchandising programs, advertising or publicity
material, characters or ideas; whether or not on your
premises or in your possession at the time of the
alleged offense.

*Id.*, FEL Endorsement.

25.     Pursuant to the "bodily injury and property damage liability" provision
contained in the Policies, St. Paul also is obligated to

pay amounts any protected person is legally required to pay
as damages for covered bodily injury or property damage
that:

- happens while this agreement is in effect; and
- is caused by an event.

*Id.* at 1, Bodily Injury and Property Damage Liability.

26.     "Bodily injury" is defined in the Policies to mean, in pertinent part,
any physical harm, including sickness or disease, to the
physical health of other persons.

9

**SECOND AMENDEDED COMPLAINT**

[St. Paul will] consider any of the following that happens at any time to be part of such physical harm, sickness or disease, if it results in or from such physical harm, sickness or disease:

- Mental anguish, injury or illness.
- Emotional distress.
- Care, loss of services, or death.

*Id.* at 2, Bodily Injury.

27.     The costs of the investigation and defense of Manzarek and Doors Touring for the *Densmore* and *Courson* lawsuits are covered by the Policies, and do not come within any exception to, exclusion from, or endorsement limiting, coverage under them.  Accordingly, in connection with the *Densmore* and *Courson* lawsuits, St. Paul was obligated to investigate those lawsuits fully and to defend and/or pay in full all defense costs incurred by Manzarek and Doors Touring in connection with those lawsuits.  St. Paul has refused to honor its obligations under the Policies in all respects.

28.     Manzarek and Doors Touring have complied with all terms and conditions precedent, to the extent not waived or otherwise excused, including payment of all premiums and providing timely notice of the *Densmore* and *Courson* lawsuits.  Manzarek and Doors Touring are entitled to the full benefits and protections provided by the Policies.  Manzarek and Doors Touring reasonably expected the Policies to protect them in connection with the *Densmore* and Courson lawsuits and reasonably relied upon the Policies for such protection.

## THE UNDERLYING LAWSUITS AND ST. PAUL'S BREACHES

### The *Densmore* Lawsuit

29.     On or about February 4, 2003, Densmore filed his lawsuit against, among others, Manzarek and Doors Touring.  A true and correct copy of the *Densmore* Complaint is attached hereto as Exhibit C and incorporated herein by reference.  On or

10

DOCSLA-32234v03

about July 31, 2003, Densmore filed a Second Amended Complaint in his lawsuit. A true and correct copy of the *Densmore* Second Amended Complaint is attached hereto as Exhibit D and incorporated herein by reference. Pursuant to the original and the Second Amended Complaint, Densmore sought damages, an accounting, injunctive relief, and disgorgement of profits against Manzarek and Doors Touring and the other defendants based upon what he alleged to be the unauthorized and wrongful use of the name *The Doors* for touring, performing, and recording activities.

30.     The *Densmore* Complaints alleged, among other things, that Manzarek and Doors Touring committed offenses in connection with wrongfully appropriating the name, trade name, logo and trademark of *The Doors*. *See* Ex. C, ¶ 1; Ex. D, ¶ 1. Densmore alleged that Manzarek's, Doors Touring's use of the name *The Doors* was a breach of a partnership agreement requiring unanimity of the partners for all decisions concerning the band. Ex. C, ¶¶ 16, 34 & 37; Ex. D, ¶¶ 38, 55 & 58. He further alleged that Manzarek and Doors Touring advertised personal appearances as *The Doors* and made public appearances as *The Doors*. Ex. C, ¶¶ 18 & 19; Ex. D., ¶¶ 31, 32 & 37. Densmore alleged that the performances and advertising by Defendants as *The Doors* and/or The Doors of the 21st Century has resulted in substantial public confusion. Ex. C, ¶ 21; Ex. D, ¶ 35. He claimed that "the defendants have held themselves out as *The Doors*, and that there has been a drummer playing with the band who is not [Densmore], has minimized and diminished [his] reputation and stature by causing people to believe that he was not, and is not, an integral and respected part of *The Doors* band, or is one member who easily can replaced by another drummer." Ex. C, ¶ 21; Ex. D, ¶ 35. Densmore further alleged that Manzarek and Doors Touring also wrongfully utilized the trademark, logo and style of the printed name *The Doors* on compact discs. Ex. C, ¶ 18; Ex. D, ¶ 31. Densmore claimed that, as a result of this purported wrongful conduct, they were liable to Densmore for various damages based upon causes of action for (1) violation of the Lanham Act; (2) Unfair Competition; (3) Violation of California's Unfair

11

DOCSLA-32234v03

1  Competition Law; (4) Violation of the Oral Partnership Agreement; (5) Breach of the

2  1971 Agreement; and (6) Breach of Fiduciary Duty.  Ex. C, ¶¶ 22-42; Ex. D, ¶¶ 39-68.

3  Therefore, the *Densmore* lawsuit contained numerous allegations against Manzarek

4  and Doors Touring that constitute "advertising injury" and "bodily injury" claims, as

5  those terms are defined in the Policies.

6       31.    On or about February 5, 2003, Manzarek and Doors Touring notified St.

7  Paul of the *Densmore* lawsuit and requested that St. Paul provide coverage to them in

8  connection with it under all applicable insurance policies for Manzarek and Doors

9  Touring.

10       32.    In a February 18, 2003, letter from St. Paul to Manzarek and Doors

11  Touring, St. Paul advised that it was undertaking an investigation and coverage

12  analysis of the matter.  However, St. Paul also stated that its "preliminary analysis and

13  opinion" was that the *Densmore* lawsuit was "not covered" under either of the

14  Policies.  St. Paul set forth this "preliminary analysis and opinion" that the lawsuit

15  was "not covered" even though it acknowledged that this preliminary denial was

16  reached (a) ***before*** the Doors Touring policy had even been delivered to Manzarek and

17  Doors Touring; (b) ***before*** St. Paul's claims handler had actually reviewed or

18  considered the policy language contained in either of the Policies, (c) ***before*** St. Paul

19  even had issued the Doors Touring Policy to the insureds *without* conducting the

20  thorough investigation mandated by law.  Thus, in breach of its duties under the

21  Policies and its duties of good faith, St. Paul decided to deny coverage without even

22  considering the policy language.  Moreover, in its February 18, 2003, letter, St. Paul

23  requested a substantial amount of information from Manzarek and Doors Touring,

24  further demonstrating that it had not conducted a full and thorough investigation of the

25  *Densmore* lawsuit before providing this "preliminary analysis and opinion" that the

26  lawsuit was "not covered."  A true and correct copy of St. Paul's February 18, 2003,

27  letter is attached hereto as Exhibit E and incorporated herein by reference.

28

33.     In a February 28, 2003, letter, Manzarek and Doors Touring responded to St. Paul's preliminary coverage denial. Manzarek and Doors Touring advised St. Paul that they disagreed with St. Paul's preliminary denial because, among other reasons, it was reached (a) without a thorough investigation of the *Densmore* lawsuit; (b) without fully inquiring into the possible bases that might support the insureds' claims for coverage; (c) before the Doors Touring policy had been delivered; and (d) before St. Paul's claims handler had even reviewed the policy language of the Policies. Therefore, Manzarek and Doors Touring requested that St. Paul immediately undertake their defense of the *Densmore* lawsuit, as it is required to do under applicable law. A true and correct copy of the February 28, 2003, letter from Manzarek and Doors Touring is attached hereto as Exhibit F and incorporated herein by reference.

34.     In a March 5, 2003, letter, St. Paul again advised that it still was investigating the *Densmore* lawsuit. However, St. Paul advised Manzarek and Doors Touring for the first time that the Policies both contain the same FEL Endorsement. St. Paul raised the FEL Endorsement as a limitation on coverage for Manzarek and Doors Touring, even though in prior correspondence St. Paul acknowledged that it did not even know the terms of the Policies and never suggested that the Policies contained any endorsements that would limit coverage for the *Densmore* lawsuit. A true and correct copy of St. Paul's March 5, 2003, letter is attached hereto as Exhibit G and incorporated herein by reference. Furthermore, even though St. Paul purported to be investigating, it refused to honor its duty to defend and refused to provide or pay for defense counsel. Thus, St. Paul knowingly deprived its insureds of the peace of mind they were entitled to and of one of the most important benefits promised in the Policies—a full and immediate defense.

35.     In a March 12, 2003, letter, Manzarek and Doors Touring advised St. Paul that the FEL Endorsement cannot operate so broadly so as to eliminate all coverage for them with respect to the *Densmore* lawsuit. If it did, it would render the

DOCSLA-32234v03

coverage under the Policies illusory by, in essence, eliminating the Policies' express coverage for advertising injury liability. A true and correct copy of Manzarek's and Doors Touring's March 12, 2003, letter is attached hereto as Exhibit H and incorporated herein by reference.

36.     In two March 19, 2003, letters, St. Paul advised that it is "not obligated to defend or indemnify" Manzarek or Doors Touring for the *Densmore* lawsuit, pursuant to the FEL Endorsement. St. Paul took this position notwithstanding the fact that it meant that its Policies did not afford any "advertising injury" coverage to Manzarek or Doors Touring, even though the Policies themselves expressly stated that they provide $1,000,000 in "advertising injury" coverage. Therefore, St. Paul knowingly took a position directly contrary to the express terms of its Policies, the reasonable understanding of its insureds, and the facts.

37.     On April 3, 2003, Manzarek and Doors Touring sent a letter to St. Paul requesting that it reconsider and immediately withdraw its erroneous denials of coverage for the *Densmore* lawsuit. Manzarek and Doors Touring again advised St. Paul that the FEL Endorsement does not operate to preclude coverage to them for the *Densmore* lawsuit. Furthermore, Manzarek and Doors Touring advised that there is no evidence that they were aware of this purported limitation or explained the ramifications of such an exclusion when St. Paul sold them the Policies. Therefore, they reasonably expected the Policies to provide coverage for personal and advertising injuries arising from their field of work – the entertainment business. Manzarek and Doors Touring also pointed out that St. Paul had failed to conduct a full and thorough investigation of the *Densmore* lawsuit and the facts surrounding that dispute, as it was required to do under California law. Manzarek and Doors Touring further advised St. Paul that there was a clear potential for Densmore to seek recovery for humiliation and emotional distress and the physical manifestations that so often accompany emotional distress, which manifestations would constitute "bodily injury" claims

DOCSLA-32234v03

1    covered by the Policies. However, St. Paul completely ignored these allegations in

2    reaching its erroneous coverage determination.

3                                **The *Courson* Lawsuit**

4         38.    The *Courson lawsuit* was commenced against Manzarek and the other

5    defendants on or about April 23, 2003. A true and correct copy of the *Courson*

6    Complaint is attached hereto as Exhibit I and incorporated herein by reference. On or

7    about March 2, 2004, the *Courson* plaintiffs filed a Second Amended Complaint. A

8    true and correct copy of the *Courson* Second Amended Complaint is attached hereto

9    as Exhibit J and incorporated herein by reference. In their Complaints, the *Courson*

10   plaintiffs sought damages, injunctive relief, disgorgement of profits, accounting and

11   imposition of a constructive trust. The *Courson* plaintiffs alleged, among other things,

12   that Manzarek committed offenses in connection with misappropriating and infringing

13   upon the valuable name and logo of *The Doors*, along with the name, photographs and

14   likeness of Jim Morrison. *See* Ex. I, ¶ 2; Ex. J, ¶¶ 30, 31 & 38.

15        39.    Specifically, the *Courson* plaintiffs alleged that defendants took the name

16   and logo of *The Doors* and were using them for the purpose of marketing and

17   promoting a new band and to confuse the public into believing that the new band was,

18   in fact, the legendary original Doors band. Ex. I; ¶¶ 18 & 19; Ex. J, ¶¶ 30 & 31. They

19   also alleged that Manzarek and the other defendants, in an attempt to deceive and

20   confuse the public, used Jim Morrison's name, likeness and photographs in

21   connection with and as part of the performances of their New Band and in the

22   promotion thereof. Ex. I, ¶¶ 20, 21 & 24; Ex. J, ¶ 38. The *Courson* plaintiffs further

23   alleged that Manzarek and the other defendants used *The Doors* website for

24   advertising and promoting the defendants' new band, their concerts and other

25   products, all without the *Courson* plaintiffs' permission. Ex. J, ¶ 32. The *Courson*

26   plaintiffs alleged that because of their conduct, Manzarek and the other defendants

27   were liable for various damages. Ex. I, ¶ 25; Ex. J, ¶ 39. Therefore, the *Courson*

28

DOCSLA-32234v03

1  *lawsuit* alleged "advertising injury liability" and an "advertising injury offense" as

2  those terms are defined in the Policies.

3      40.    In a May 6, 2003, letter, St. Paul acknowledged receipt of the *Courson*

4  *lawsuit* and Manzarek's and Doors Touring's request that St. Paul agree to provide

5  them a defense and indemnity.  However, similar to what it had done with the

6  *Densmore* lawsuit, St. Paul denied coverage and refused to defend its insureds in the

7  *Courson lawsuit* based upon its interpretation of the FEL Endorsement.  St. Paul

8  denied coverage even though it acknowledged that it had not completed a full and

9  thorough investigation of the *Courson lawsuit* and the facts surrounding the dispute.

10  And, St. Paul refused to defend or pay for the costs of defense incurred by its insureds.

11  A true and correct copy of St. Paul's May 6, 2003, letter is attached hereto as Exhibit

12  K and incorporated herein by reference.

13      41.    In a May 22, 2003, letter, Manzarek and Doors Touring responded to St.

14  Paul's preliminary coverage denial of the *Courson lawsuit*.  Manzarek and Doors

15  Touring advised St. Paul that its preliminary denial was wrong because, among other

16  reasons, it was made without a full and thorough investigation of the *Courson lawsuit*.

17  Manzarek  and Doors Touring, therefore, requested that St. Paul immediately

18  undertake their defense of the *Courson lawsuit* during any investigation, as it is

19  required to do by applicable law.  A true and correct copy of the May 22, 2003, letter

20  from Manzarek and Doors Touring is attached hereto as Exhibit L and incorporated

21  herein by reference.

22      42.    Despite the fact that, based upon the allegations of the *Courson lawsuit*

23  and the express terms of the Policies, St. Paul was obligated to assume the defense of

24  the lawsuit, in two August 4, 2003, letters, St. Paul refused to defend or indemnify

25  Manzarek or Doors Touring for the *Courson lawsuit*, citing the FEL Endorsement.

26                              **ST. PAUL'S BREACHES**

27      43.    Manzarek and Doors Touring continued to correspond with St. Paul

28  keeping them apprised of the status of the *Densmore* and *Courson* lawsuits and

DOCSLA-32234v03

1  continually requesting that St. Paul withdraw its unreasonable and wrongful denials of

2  coverage.  Manzarek and Doors Touring also continued to request that St. Paul

3  assume the defense of the *Densmore* and *Courson* lawsuits on their behalf.  For

4  example, in a June 18, 2004, letter to St. Paul, Manzarek and Doors Touring again

5  advised St. Paul why its denials of coverage were erroneous.  They further requested

6  that a St. Paul representative meet with them before the trial began in the *Densmore*

7  and *Courson* lawsuits, which was scheduled for June 28, 2004.

8      44.   St. Paul told Manzarek and Doors Touring that it would not respond to

9  them until after the trial was scheduled to start.  Thus, St. Paul ignored the interests of

10  its insureds on the very eve of trial.

11      45.   On June 28, 2004, the *Densmore* and *Courson* lawsuits were consolidated

12  and trial commenced.  Manzarek and Doors Touring were forced to defend themselves

13  in the *Densmore* and *Courson* lawsuits without any assistance from St. Paul.

14      46.   After the trial was underway, St. Paul belatedly responded to the request

15  by Manzarek and Doors Touring to address their claims for coverage.  In St. Paul's

16  July 8, 2004, letter, however, it merely reiterated its erroneous and unreasonable

17  position that coverage was precluded for the *Densmore* and *Courson* lawsuits pursuant

18  to the FEL Endorsement contained in the Policies.  St. Paul also erroneously took the

19  position, without an adequate investigation, that "under the bodily injury coverage in

20  [St. Paul's] policies . . . the underlying complaints simply contain no allegations of

21  emotional distress or physical harm, sickness or disease."

22      47.   On September 27, 2004, the jury verdict was returned in the *Densmore*

23  and *Courson* lawsuits.  While the jury found Manzarek liable on some of the causes of

24  action, it awarded no damages against him or any of the defendants or cross-

25  defendants.  Also, Doors Touring was not found liable on any of the causes of action

26  in the *Densmore* and *Courson* lawsuits.  Following the trial, the Court examined the

27  claims to determine which ones were equitable in nature, thereby requiring decisions

28  by the Court.  On May 9, 2005, the Court released its Proposed Statement of Decision

DOCSLA-32234v03

1  on what it determined to be the equitable claims and advised that it intended to order

2  relief in Densmore's favor on certain of these claims.

3      48.    On May 4, 2005, Manzarek and Doors Touring sent another letter to St.

4  Paul, again explaining why St. Paul's denials of coverage for the *Densmore* and

5  *Courson* lawsuits were erroneous and requesting that its denials be withdrawn.  In

6  their letter, Manzarek and Doors Touring specifically pointed to California decisions

7  in which courts had found the FEL Endorsement to be inapplicable or ambiguous and

8  held that the FEL Endorsement did not bar coverage for the insureds.  These decisions

9  demonstrated that St. Paul's over-expansive interpretation of the FEL Endorsement in

10  connection with the *Densmore* and *Courson* lawsuits was unreasonable and simply

11  wrong.  Therefore, St. Paul has no good faith basis to continue to deny coverage to

12  Manzarek and Doors Touring for claims made in the *Densmore* and *Courson* lawsuits.

13      49.    On May 29, 2008, the California Court of Appeal affirmed the trial

14  court's judgments rendered against Manzarek and Doors Touring in the *Densmore* and

15  *Courson* lawsuits.  The Court also affirmed the trial court's permanent injunction,

16  which precludes Manzarek and Robbie Krieger, another former member of *The*

17  *Doors*, and an insured under the Policies, from holding themselves out as the musical

18  band *The Doors*, The Doors of the 21st Century or using a name including the words

19  "The Doors."  The injunction also bars Manzarek's and Krieger's use of The Doors

20  logo.  They also were enjoined from using the name, likeness, voice or image of Jim

21  Morrison to promote their band or their concerts.

22      50.    St. Paul's denial of coverage for the *Densmore* and *Courson* lawsuits is

23  unreasonable and wrong.  Indeed, as the Ninth Circuit Court of Appeals held in its

24  March 25, 2008, decision, 519 F.3d 1025 (9th Cir. 2008), the allegations in the

25  *Densmore* and *Courson* lawsuits "raised a potential for coverage under the

26  [advertising injury provisions of the] Policies and, for that reason, the district court

27  erred by summarily dismissing Manzarek's and [Doors Touring's] breach of contract

28  claim." *Id.* at 2986.

51.     St. Paul further has no basis to continue to deny coverage to Manzarek and Doors Touring for claims made in the *Densmore* and *Courson* lawsuits because, as the Ninth Circuit also held those lawsuits "raised a potential for coverage under the 'bodily injury' portion of the Policies." *Id.* Indeed, "the Densmore lawsuit contained an allegation that Manzarek's and [Doors Touring's] actions caused damage to Densmore's 'reputation and stature by causing people to believe that he was not, and is not, an integral and respected part of *The Doors* band, or is one member who easily can be replaced by another drummer.'" *Id.* Thus, as the Ninth Circuit held, "this allegation was sufficient to raise the potential of an award of mental anguish or emotional distress damages." *Id.* at 2987.

52.     Furthermore, as the Ninth Circuit also pointed out: "It should go without saying that an insured cannot be deemed to reasonably understand the terms of a policy he or she has not seen or fully comprehend the exclusionary language of a policy that has not yet been issued." *Id.* Thus, there was a potential for coverage under the Policies under at least two separate coverages (advertising injury and bodily injury) and St. Paul's continued denial of coverage to its insureds for the *Densmore* and *Courson* lawsuits was, and is, unreasonable and wrong..

53.     Despite the repeated requests by Manzarek and Doors Touring that St. Paul reimburse past defense costs and assume a present duty to defend them in the *Densmore* and *Courson* lawsuits, St. Paul unreasonably and arbitrarily has refused to honor its defense duty and has continued to ignore its other duties imposed by contract, by law, and by insurance industry custom and practice.  St. Paul has not paid even a single penny of the more than $3,800,000 in defense fees and costs incurred by and owing to Manzarek and Doors Touring.  Instead, St. Paul continues to allow Manzarek and Doors Touring to bear the brunt of these fees and costs without the financial support it promised in the Policies to provide.

DOCSLA-32234v03

# FIRST CAUSE OF ACTION

## (Breach of Contract Regarding the Duty To Defend Against St. Paul)

54.     Manzarek and Doors Touring reallege and incorporate by reference herein each allegation contained in paragraphs 1 through 53 above.

55.     St. Paul owed, and continues to owe, Manzarek and Doors Touring a defense of the *Densmore* and *Courson* lawsuits because at least some of the facts and allegations in those lawsuits are potentially covered by the Policies.  Indeed, the Ninth Circuit specifically has held that the allegations in these lawsuits raised a potential for coverage under the Policies.  *Id.* at 2986.  Thus, St. Paul had a duty to defend its insureds that arose immediately upon notice.  St. Paul's commitment to defend Manzarek and Doors Touring was a significant right afforded to them under the Policies.  This is a promise that St. Paul wrongfully breached when it denied coverage, forcing Manzarek and Doors Touring to incur substantial attorneys' fees and costs to conduct their own defense, which fees and costs currently exceed $3,800,000, plus interest.

56.     St. Paul had a duty under the Policies, the law, and insurance industry custom and practice to conduct a full and thorough investigation, including of all bases that might support Manzarek's and Doors Touring's claims for coverage, before denying coverage as to either the *Densmore* lawsuit or *Courson lawsuit*.  Manzarek and Doors Touring are informed and believe, and based thereon allege, that instead of performing this duty, St. Paul denied coverage based on, at most, a review of one of its Policies and the *Densmore* complaint, and that St. Paul conducted no independent investigation and did not seek, or properly consider, any material extrinsic evidence. Indeed, St. Paul denied coverage to Manzarek and Doors Touring for the *Densmore* lawsuit before one of the Policies had even been issued, much less delivered to the insureds, and without even knowing what policy forms and endorsements were contained in the Policies.

DOCSLA-32234v03

57.     St. Paul breached its duties under the Policies by, among other things, (a) failing and refusing to defend Manzarek and Doors Touring in the *Densmore* and *Courson* lawsuits; (b) failing to conduct a full and thorough investigation of the *Densmore* and *Courson* lawsuits, and asserting grounds for denying coverage based on its inadequate investigation; (c) asserting grounds for denying coverage that it knows are not supported by, and in fact are contrary to, the terms of the Policies, the law, insurance industry custom and practice, and the facts; (d) failing to fully inquire into possible bases that might support coverage for the *Densmore* and *Courson* lawsuits; (e) failing to honor its promises and representations in its Policies that it would defend its insureds in suits alleging damages that the insureds are legally obligated to pay, for "advertising injury," and "bodily injury;" (f) failing to properly interpret the language of the FEL Endorsement with respect to the factual allegations of the complaints of the *Densmore* and *Courson* lawsuits, instead applying the FEL Endorsement in an overly broad manner so as to deny coverage for the entirety of the allegations in the *Densmore* and *Courson* lawsuits; (g) wrongfully denying coverage and thereby depriving Manzarek and Doors Touring of the financial resources that would have enabled them to settle the *Densmore* and *Courson* lawsuits, which would have resulted in them avoiding the adverse judgments against them in the *Densmore* and *Courson* lawsuits, which now have been affirmed by the California Court of Appeal; and (h) failing to promptly (or ever) reimburse Manzarek and Doors Touring for any of the fees and expenses that they incurred in the defense of the *Densmore* and *Courson lawsuits*; and (i) by giving greater consideration to its own interests than it gave to the interests of Manzarek and Doors Touring.

58.     As a direct and proximate result of St. Paul's acts, Manzarek and Doors Touring have been damaged in an amount in excess of $3,800,000, plus interest.

DOCSLA-32234v03

## SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith
### and Fair Dealing Against St. Paul)

59.     Manzarek and Doors Touring reallege and incorporate by reference herein each allegation contained in paragraphs 1 through 58 above.

60.     Implied in the Policies sold by St. Paul were covenants that St. Paul would act in good faith and deal fairly with its insureds, that St. Paul would do nothing to interfere with the rights of Manzarek and Doors Touring, its insureds, to receive the benefits of the Policies, and that St. Paul would give at least the same level of consideration to its insureds' interests as it gives to its own interests.  Instead of complying with these duties, St. Paul acted in bad faith by:

a.     Wrongfully and unreasonably refusing to defend and/or reimburse Manzarek and Doors Touring for the attorneys' fees and costs that they have incurred in their defense of the *Densmore* and *Courson* lawsuits, which currently are in excess of $3,800,000;

b.     Failing to conduct a full and thorough investigation of the *Densmore* and *Courson* lawsuits and facts surrounding the disputes, and asserting grounds for denying coverage based on its inadequate investigation;

c.     Wrongfully and unreasonably asserting grounds for denying coverage that St. Paul knows are not supported by, and in fact are contrary to, the terms of the Policies, the law, insurance industry custom and practice, and the facts;

d.     Failing to fully inquire into possible bases that might support coverage for the *Densmore* and *Courson* lawsuits;

e.     Failing to honor its promises and representations in its Policies that it would defend its insureds in lawsuits alleging damages that the

DOCSLA-32234v03

insureds are legally obligated to pay, for "advertising injury" and "bodily injury;"

f.  Failing to properly interpret the language of the FEL Endorsement with respect to the factual allegations of the complaints of the *Densmore* and *Courson* lawsuits, instead applying the FEL Endorsement in an overly broad manner so as to deny coverage for the entirety of the allegations in the *Densmore* and *Courson* lawsuits;

g.  Wrongfully denying coverage and thereby depriving Manzarek and Doors Touring of the financial resources that would have enabled them to settle the *Densmore* and *Courson* lawsuits, which would have resulted in them avoiding the adverse judgments against them in the *Densmore* and *Courson* lawsuits; and

h.  Giving greater consideration to its own interests than it gave to the interests of Manzarek and Doors Touring; and

i.  Otherwise acting as alleged above.

61.   In breach of the implied covenant of good faith and fair dealing, St. Paul did the things and committed the acts alleged above for the purpose of consciously withholding from Manzarek and Doors Touring the rights and benefits to which they are and were entitled under the Policies.  St. Paul's acts are inconsistent with the reasonable expectations of Manzarek and Doors Touring, are contrary to established claims practices and legal requirements, are contrary to the express terms of St. Paul's Policies, and constitute bad faith.

62.   St. Paul's conduct is despicable and has been done with a conscious disregard of the rights of Manzarek and Doors Touring, constituting oppression, fraud, and/or malice, in that St. Paul engaged in a series of acts designed to deny the benefits due under its Policies.  Specifically, St. Paul, by acting as alleged above, in light of information, facts, and relevant law to the contrary, consciously disregarded the rights

of Manzarek and Doors Touring and forced them to incur substantial and oppressive financial losses, without any assistance from it, thereby inflicting substantial financial damage on Manzarek and Doors Touring.  St. Paul ignored the interests and concerns of Manzarek and Doors Touring, with the requisite intent to injure within the meaning of California Civil Code section 3294.  Therefore, Manzarek and Doors Touring are entitled to recover punitive damages from St. Paul in an amount that is sufficient to punish and make an example of St. Paul and in order to deter similar conduct in the future.

63.     Pursuant to the holding in *Brandt v. Superior Court,* 37 Cal. 3d 813 (1985), Manzarek and Doors Touring are entitled to recover all attorneys' fees that they reasonably incurred, and continue to incur, in their efforts to obtain the benefits of insurance that have been, and continue to be, wrongfully and in bad faith withheld by St. Paul.  When the precise amount of these fees is known, Manzarek and Doors Touring will seek leave of court to amend this complaint.

64.     As a direct and proximate result of St. Paul's acts, Manzarek and Doors Touring have been damaged in an amount in excess of the Court's jurisdictional limits.  The actual amount of damages has not been precisely ascertained yet, but includes the fees and expenses that Manzarek and Doors Touring incurred, and may incur, in their defense of the *Densmore* and *Courson* lawsuits, which currently are in excess of $3,800,000, and other damages not yet known or determined, plus interest. When the precise amount of their damages is known, Manzarek and Doors Touring will seek leave to amend this complaint.

## THIRD CAUSE OF ACTION

### (Declaratory Relief Regarding the Duty to Indemnify

### By Manzarek Against St. Paul)

65.     Manzarek realleges and incorporates by reference the allegations contained in paragraphs 1 through 64 above.

66.     Manzarek contends that, if he ultimately should be obligated to pay on a judgment, as stated in the Court's May 9, 2005, Proposed Statement of Decision in the *Densmore* and *Courson* lawsuits, and affirmed in the Court of Appeal's May 29, 2008, decision, then pursuant to the terms of its Policies, St. Paul has a duty to indemnify Manzarek for such payment.  St. Paul disagrees.

67.     As a result of St. Paul's denial of coverage regarding the *Densmore* and *Courson* lawsuits, an actual and justiciable dispute exists between St. Paul and Manzarek regarding the extent of coverage regarding the *Densmore* and *Courson* lawsuits and the ultimate judgment in the *Densmore* and *Courson* lawsuits.

68.     Manzarek desires a judicial determination and declaration of his and St. Paul's respective obligations and duties under the Policies.  Specifically, Manzarek seeks a declaration of his rights to indemnification by St. Paul regarding the *Densmore* and *Courson* lawsuits.

### FOURTH CAUSE OF ACTION

### (Declaratory Relief Against Does 1 through 10)

69.     Manzarek and Doors Touring reallege and incorporate by reference herein each allegation contained in paragraphs 1 through 68 above.

70.     Manzarek and Doors Touring are informed and believe, and on that basis allege, that Does 1 through 10 dispute that Manzarek and Doors Touring are entitled to insurance coverage for the *Densmore* and *Courson* lawsuits.  Therefore, an actual and justiciable controversy exists between Manzarek and Doors Touring, on the one hand, and Does 1 through 10, on the other hand, concerning the matters alleged herein.

71.     Manzarek and Doors Touring therefore seek a judicial declaration as to the duties of Does 1 through 10, including the duty to defend Manzarek and Doors Touring under the Policies, confirming that Manzarek's and Doors Touring's contentions, as stated above, are correct.  A declaration is necessary at this time in

**SECOND AMENDEDED COMPLAINT**

DOCSLA-32234v03

order that the parties' dispute may be resolved and that they may be aware of their respective rights and duties.

## **PRAYER FOR RELIEF**

WHEREFORE, Manzarek and Doors Touring pray for judgment as follows:

1.     On the First Cause of Action, for damages, plus interest, according to proof at the time of trial, but at least $3,800,000;

2.     On the Second Cause of Action:

    a.     For damages, plus interest, according to proof at the time of trial, but at least $3,800,000;

    b.     For reasonable attorneys' fees and expenses incurred in obtaining the benefits due under the Policies, plus interest;

    c.     For punitive damages in an amount to be determined at the time of trial;

3.     On the Third Cause of Action, for a declaration in accord with the contentions of Manzarek stated above;

4.     On the Fourth Cause of Action, for a declaration in accord with the contentions of Manzarek and Doors Touring stated above;

5.     On all causes of action:

    a.     For costs of suit incurred herein;

    b.     Interest; and

    c.     For such other, further, and/or different relief as may be just and proper.

Dated:  July 23, 2008                 DICKSTEIN SHAPIRO LLP

                                      BY: _____
                                          Susan Page White
                                          Attorneys for Plaintiffs

**SECOND AMENDEDED COMPLAINT**

## **DEMAND FOR JURY TRIAL**

Manzarek and Doors Touring hereby demand trial by jury.

Dated:  July 23, 2008

DICKSTEIN SHAPIRO LLP

BY: _____

Susan Page White
Attorneys for Plaintiffs

---

**SECOND AMENDEDED COMPLAINT**

DOCSLA-32234v03

**EXHIBIT A**

## INTRODUCTION

The **StPaul**

This policy protects against a variety of losses. There are also some restrictions. We've written this policy in plain, easy-to-understand English. We encourage you to read it carefully to determine what is and what is not covered, as well as the rights and duties of those protected.

Policy Number: CKO4506093

ENCORE ENTERTAINMENT
10969 VENTURA
STUDIO CITY CA 91604

In return for your premium, we'll provide the protection stated in this policy.

We, us, our, and ours mean **St. Paul Fire and Marine Insurance Company**. We're a capital stock company located in St. Paul, Minnesota.

The words you, your, and yours mean the insured named here, which is a

CORPORATION
RAYMOND MANZAREK
C/O GOLDMAN & KNELL, CPA
1801 CENTURY PARK EAST, #216
LOS ANGELES CA 90067

***INSURED NAMES CONTINUED ON BACK***

Your policy is composed of General Rules, an explanation of What To Do If You Have A Loss, one or more Coverage Summaries, and one or more Insuring Agreements explaining your coverage. It may also include one or more endorsements. Endorsements are documents that change your policy. The Policy Forms List shows all the forms included when this policy begins.

One of our authorized representatives will also countersign the policy.

This policy will begin on 05/24/02 and will continue until 05/24/03

Your former policy number is automatically replaced: NEW

Your premium for the policy period shown is:          $5,050.00

However, please refer to the Premiums section of the General Rules to see how final premiums are determined.

Our authorized representative is:
6205511
ENCORE ENTERTAINMENT INS SVCS
10969 VENTURA BLVD
STUDIO CITY CA 91604

*Jay S. Fishman*
President

Authorized Representative          Date

*[Signature]*
Secretary

**Processing Date** 10/03/02  17:40  001

40800 Ed. 5-87 Printed in U.S.A.
©St.Paul Fire and Marine Insurance Co.1984 All Rights Reserved

Introduction

Page      5

Exhibit ___A___

Page ___28___

The **St Paul**

    INSURED NAMES CONTINUED:
RAYMOND MANZAREK, AN INDIVIDUAL
AMERICAN ATEN

©St.Paul Fire and Marine Insurance Co.1984 All Rights Reserved

Exhibit _A_
Page _29_

## POLICY FORM LIST

The St.Paul

Here's a list of all forms included in your
policy, on the date shown below.  These forms
are listed in the same order as they appear in
your policy.

| Title | Form Number | Edition Date |
|---|---|---|
| Introduction – St. Paul Fire And Marine Insurance Company | 40800 | 05-87 |
| Policy Form List | 40705 | 05-84 |
| General Rules | 40701 | 09-96 |
| California Required Endorsement | 40769 | 09-01 |
| Commercial Auto Required Endorsement – California | 44270 | 11-01 |
| What To Do If You Have A Loss | 40814 | 11-91 |
| Miscellaneous Equipment Protection Coverage Summary | I0051 | 12-97 |
| Miscellaneous Property Protection – Entertainment | I0050 | 12-97 |
| Commercial General Liability Protection Coverage Summary | 47110 | 01-96 |
| Commercial General Liability Protection Estimated Premium Summary | 43492 | 04-94 |
| Commercial General Liability Protection | 47500 | 01-01 |
| Described Concert Or Performance Exposures Limitation Endorsement | L0082 | 12-97 |
| Described Operations Limitation Endorsement | L0081 | 12-97 |
| Entertainers Liability Limitation Endorsement | L0076 | 12-97 |
| Field Of Entertainment Limitation Endorsement | L0077 | 12-97 |
| Limitation Endorsement | L0071 | 12-97 |
| Employment-Related Practices Exclusion Endorsement | 47153 | 10-93 |
| Republic Of Mexico Auto Liability Coverage Endorsement | A0136 | 08-98 |
| Auto Liability Protection | 44449 | 04-91 |
| Auto Liability Protection | 44449 | 12-93 |
| Republic Of Mexico Auto Physical Damage Coverage Endorsement | A0139 | 08-98 |
| Nonowned And Hired Auto Physical Damage Endorsement | A0100 | 12-97 |
| Auto Physical Damage Protection | 44455 | 07-96 |

---

| Name of Insured | Policy Number CK04506093 | Effective Date 05/24/02 |
|---|---|---|
| RAYMOND MANZAREK | Processing Date 10/03/02  17:40  001 | |

---

Exhibit   A
Page   80

The **St Paul**

Exhibit _____ A
Page _____ 31

**GENERAL RULES**

The **St Paul**

These rules apply to the entire policy unless
you're notified otherwise.

---

### Special Rights And Duties Of The First Named Insured

You agree that when more than one insured
is named in the introduction, the first named
insured has special rights and duties. These
rights and duties are explained in the
following General Rules:

- Premiums.
- Cancellation.
- Policy Changes.

### Your Policy Period

Insuring agreements in this policy begin at
12:01 a.m., standard time, on the effective
date. If this policy replaces policies ending
at noon, rather than 12:01 a.m., coverage
begins at noon when the old policy ends.

Insuring agreements or endorsements added
to this policy after its effective date begin
on the effective date of the added
agreement.

Coverage ends at 12:01 a.m., standard time,
on the expiration date. If all or part of this
policy is cancelled for any reason before
that date, that coverage will end at 12:01
a.m., standard time, on the cancellation date.

### Premiums

We compute the premium you pay for this
policy using information available at the
time. So, all or part of your premium may
be based on estimates. If estimates are
used, we'll compute your actual premium
when complete information is available at
the end of the policy period. If it's more
than you've paid, you'll owe us the
difference. If it's less, we'll return the
difference.

In any event, you won't pay less than any
minimum annual premium agreed on.

The first named insured is responsible for
paying all premiums and will be the one to
whom we'll pay any return premiums.

In some instances, such as when coverage
under your policy is changed, there may be
a difference in your premium. If this
happens, either you will owe us additional
premium or we will owe you a refund. If
the difference in premium that you owe us
is $15 or less, we'll waive this amount. If
the difference in premium we owe you is
$15 or less, we won't refund this amount
unless you request that we refund it. We'll
apply this waiver of premium practice
separately each time your policy is
endorsed.

You must keep accurate records of the
information we'll need to compute your
premium. Your agent can explain the type of
records we'll need. The first named insured
agrees to send copies of these records at
the end of each policy period - or any other
time we request them.

### Our Right To Inspect And Audit

You agree to let us inspect your property
and business operations during normal
business hours while this policy is in force.
We're not, however, required to make
inspections. Nor will we guarantee that your
property or operations are safe, or that they
conform to any laws, codes, standards or
regulations. This rule also applies to any
organization which makes insurance
inspections, surveys, reports or
recommendations for us. You also agree to
let us examine and audit your financial
books and records that relate to this
insurance at any time up to 3 years after
this policy ends

### Policy Changes

This policy contains all the agreements
between you and us concerning this
insurance. The first named insured is

---

40701 Rev. 9-96 Printed in U.S.A.
©St.Paul Fire and Marine Insurance Co.1996 All Rights Reserved

Endorsement

Page 1 of 3

Exhibit _A_

Page _B9_

The St.Paul

authorized to make changes in this policy with our consent. This policy can only be changed by a written form included as part of the policy. This form must be signed by one of our authorized representatives.

We make changes in our standard insurance policy forms from time to time. These changes must conform to state law and are filed with insurance supervisory authorities for approval. While your coverage is in force we can make any change in the form of this policy that broadens or extends your coverage. If we do, and the change can be added to your policy without increasing the premium, you'll automatically receive the benefit of the extended or broadened coverage on the day the change is effective in your state.

### Assignment And Transfers

Neither you nor anyone else covered under this policy can assign or turn over your interest in it without our written consent attached to the policy.

However, there is one exception. If you are an individual named insured and you die, your rights and duties will be transferred to your legal representative; but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having temporary custody of your property will have your rights and duties concerning that property.

### Cancellation

The first named insured can cancel this policy in whole or part at any time.

To cancel, the first named insured must deliver the policy or the part to be cancelled to us or to any of our authorized agents. If this isn't possible notify us by mail and include the date coverage is to end. We'll refund the unused premium to the first named insured, less a charge for early cancellation.

If we cancel this policy, we'll mail or deliver a cancellation notice to the first named insured at least 30 days before coverage will end; 10 days if we're cancelling for nonpayment of premium. If

notice is mailed, proof of mailing to the first named insured's last mailing address known to us will be considered proof you were notified. Any unused premium will be refunded to the first named insured as soon as possible. However, the cancellation will be effective whether or not we've made or offered a refund.

### Recovering Damages From A Third Party

Any person protected under this policy may be able to recover all or part of a loss from someone other than us. Because of this, each protected person must do all that's possible after a loss to preserve any right of recovery available. If we make a payment under this policy that right of recovery will belong to us. If we recover more than we've paid, the excess will belong to the person who had the loss. But we'll deduct our recovery expenses first.

### Fraud And Misrepresentation

This policy is void if you or any other protected person hide any important information from us, mislead us, or attempt to defraud or lie to us about any matter concerning this insurance – either before or after a loss. Of course, everyone makes mistakes. Unintentional errors or omissions won't affect your rights under this policy

### Appraisal Of Property Disputes

If your policy includes property insurance and agreement can't be reached on the amount of a property loss or the value of the property, the following procedure will be used:

1. One of us will make a written demand for an appraisal.

2. Each will select a competent and impartial appraiser and notify the other of the selection within 30 days of the demand.

3. The appraisers will select a competent and impartial umpire. If they can't agree on an umpire, either may ask that one be selected by a judge of a court having jurisdiction.

©St.Paul Fire and Marine Insurance Co.1996 All Rights Reserved

Exhibit _A_
Page _B3_

The St Paul

4. The appraisers will state separately the amount of the loss and the value of the property. If they don't agree, they'll submit their appraisals to the umpire. Agreement of two out of three will be binding..

You'll pay your appraiser and we'll pay ours. Other costs of the appraisal and the umpire will be shared equally by you and us.

If we submit to an appraisal, we'll still retain our right to deny the claim.

## How State Law Affects This Policy

Any part of this policy that conflicts with state law is automatically changed to conform to the law.

## Lawsuits Against Us

No one can sue us to recover under this policy unless all of its terms have been lived up to.

**If your policy includes property insurance.** Any lawsuit to recover on a property claim must begin within 2 years after the date on which the direct physical loss or damage occurred. State law gives you more time for property located in these states:

- North Dakota, North Carolina, Maryland – 3 years
- Wyoming – 4 years; and
- Kansas, Nebraska – 5 years

**If your policy includes liability insurance.** No one can sue us to recover on a liability claim until the amount of the protected person's liability has been finally decided either by a trial or by a written agreement signed by the protected person, by us and by the party making this claim. Once liability has been determined by judgment or by written agreement, the party making the claim may be able to recover under this policy, up to the limits of coverage that apply. But that party can't sue us directly or join us in a suit against the protected person until liability has been so determined.

If the protected person or his or her estate goes bankrupt or becomes insolvent, we'll still be obligated under this policy.

Exhibit _A_

Page _B-1_

## WHAT TO DO IF YOU HAVE A LOSS

TheStPaul

You or other protected persons are required to perform the duties described below when a property loss that may be covered under this policy happens or an accident or incident happens that could result in liability damages covered under this policy. Failure to comply

could affect coverage. The insuring agreements contained in this policy determine what is covered. As a result, you should read them carefully to understand the extent of the coverage provided.

### When This Policy Provides Property Protection

If there is a property loss that may be covered by property protection provided in this policy you must:

1. Notify the police if a law may have been broken.

2. Tell us or our agent what happened as soon as possible. Include the time and place of the event, a description of the property and the names and addresses of any witnesses.

3. Do what is reasonable and necessary to protect covered property from further damage. Keep a record of your expenses for consideration in your claim.

4. If feasible, separate the damaged property from the undamaged and make an inventory of the damaged items.

5. Cooperate with us in the investigation and settlement of the claim. Permit us to inspect the damaged property and any records pertaining to your loss as many times as may be required. Permit us to take samples of damaged and undamaged property for testing and analysis.

6. Allow us to examine you or any other insured under oath while not in the presence of any other insured. We may do this whenever reasonably required about any matter relating to this insurance or the claim. Any insured we examine must sign a copy of their answers.

7. Send us a signed, sworn proof of loss containing the information we need to resolve the claim. You must do this within 60 days after our request. We'll supply the forms. We'll pay within 30 days after we reach agreement with you.

### When This Policy Provides Liability Protection

If an accident or incident happens that may involve liability protection provided in this policy, you or any other protected person involved must:

1. Notify the police if a law may have been broken.

2. Tell us or our agent what happened as soon as possible. Do this even though no demand for damages has been made against you or any other protected person, but you or another protected person is aware of having done something that may later result in a demand for damages. This notice should include all of the following:
● The time and place of the accident or incident;
● The protected person involved;
● The specific nature of the accident or incident including the type of demand for damages that may result; and
● The names and addresses of any witnesses and injured people.

*Important Notice For Health Care Providers*
If your policy includes one of our claims-made medical professional liability protection insuring agreements, you should also read the When This Agreement Covers Section of that agreement. We won't consider a "Patient Incident Report," "Variance Report," or any other report made for loss prevention purposes to be your report of a claim. This applies even if you send it to us or one of our agents.

3. Send us a copy of all written demands. Also send us a copy of all legal documents if someone starts a lawsuit.

4. Cooperate and assist us in securing and giving evidence, attending hearings and trials, and obtaining the attendance of witnesses.

5. Not assume any financial obligation or pay out any money without our consent. But this rule doesn't apply to first aid given to others at the time of an accident.

Exhibit _A_

Page _85_

**COMMERCIAL GENERAL LIABILITY PROTECTION ESTIMATED PREMIUM SUMMARY**

The **St.Paul**

This summary applies to your Commercial General Liability Protection.

## What This Summary Does

All or part of your Commercial General Liability Protection premium is estimated. It's based on estimated exposure. This summary shows when and how we'll figure your actual premium.

*Exposure* means the amount of premium basis developed for each rating classification shown in the Estimated Premium Table.

**When we'll figure your actual premium.** We'll figure your actual premium at the end of the policy year. If an interim audit period is shown, we'll also figure your premium at the end of each such period during the policy year.

You agree to promptly provide your actual exposure for the policy year, and if shown, each interim audit period, when we request them or make a physical audit.

**How we'll figure your actual premium at the end of the policy year.** We'll multiply your actual exposure by the rates shown in the Estimated

Premium Table. This will determine your actual premium for the policy year. If it's more than the premium we previously charged, you'll pay the balance when due. If it's less, you'll get credit for the difference. But you won't pay less than the total of the highest minimum premium for each coverage that's subject to a rating classification with a minimum premium and an actual exposure for the policy year. We'll figure the total by using only the highest minimum premium that applies to each such coverage.

**How we'll figure your actual premium during the policy year.** If an interim audit period is shown, we'll multiply your actual exposure by the rates shown in the Estimated Premium Table. This will determine your actual premium for that period. You'll pay this premium when due, in addition to any other premium we previously charged.

**Other Terms**

All other terms of your policy remain the same.

**Interim audit period:** Annually

| Estimated Premium Table | Annual Estimated Exposure | Final Rate | Annual Minimum Premium |
|---|---|---|---|
| From: 05-24-02 To 05-24-03<br>Class Code: 9AAJH-001 PREMISES/OPERATIONS<br>ENTERTAINERS/PERFORMERS PER EVENT<br>Premium basis: PER PERFORMANCE<br>The rate applies per:     1<br>ENTERTAINER<br>STATE: CA    Territory: 003 | 160 | 18.750 | $2,500.00 |

| | | |
|---|---|---|
| **Name of Insured**<br>RAYMOND MANZAREK | **Policy Number** CK04506093<br>**Processing Date** 10/03/02  17:40  001 | **Effective Date** 05/24/02 |

Exhibit _A_
Page _36_

The St Paul

©St.Paul Fire and Marine Insurance Co.1994 All Rights Reserved

Exhibit _A_
Page _37_



## COMMERCIAL GENERAL LIABILITY PROTECTION
## COVERAGE SUMMARY

The St.Paul

This Coverage Summary shows the limits of
coverage that apply to your Commercial
General Liability Protection. It also lists those
endorsements, if any, that must have certain
information shown for them to apply.

### Limits Of Coverage

| | | |
|---|---|---|
| General total limit. | $ | 1,000,000 |
| Products and completed work total limit. | $ | 1,000,000 |
| Personal injury each person limit. | $ | 1,000,000 |
| Advertising injury each person limit. | $ | 1,000,000 |
| Each event limit. | $ | 1,000,000 |
| *Premises damage limit.* | $ | 50,000 |
| *Medical expenses limit.* | $ | 5,000 |

### Named Endorsement Table

**Important Note:** Only endorsements that must have certain information shown for them to apply
are named in this table. The required information follows the name of each such endorsement.
Other endorsements may apply too. If so, they're listed on the Policy Forms List.

---

**Name of Insured**
RAYMOND MANZAREK

**Policy Number** CK04506093

**Effective Date** 05/24/02
**Processing Date** 10/03/02   17:40   001

Exhibit *A*
Page *88*

The **StPaul**

©St.Paul Fire and Marine Insurance Co.1996 All Rights Reserved

Exhibit _A_
Page _39_

MISCELLANEOUS EQUIPMENT PROTECTION
COVERAGE SUMMARY

The **St Paul**

This Coverage Summary shows the limits and
extent of your Miscellaneous Equipment
Protection.

**Description Of Equipment:**
MUSICAL INSTRUMENTS--ELECTRONIC

**Business Of Insured:**
ENTERTAINER

**Principle Location:**
1801 CENTURY PARK EAST #216
LOS ANGELES, CA 90067

| Coverage Territory: | |
|---|---|
| ☐ | Continental United States and Canada |
| ☐ | United States it's territories and possession, Canada, EC and other Western European Countries, Australia and New Zealand |
| ☒ | Unlimited Worldwide |

Coinsurance Percentage:  100%
Policy Minimum Premium:  $1000.00

**Schedule Of Limits And Deductibles**

| | | Limit of Coverage | Deductible |
|---|---|---|---|
| I. **Covered Property** | | | |
| Owned Equipment | Scheduled: | | |
| | Unscheduled: | $25,000 | $500 |
| Equipment of Others: | | | |
| Mobile Studio Vehicles | Scheduled: | | |
| Total Limit: | | $25,000 | |
| Scheduled Property: | | | |
| ☐ List is Attached | ☐ On file with the Company | ☒ Not Covered | |

**Schedule Of Limits And Deductibles Continued**

| | Limit of Coverage | Deductible |
|---|---|---|
| II. **Additional Benefits** | | |
| Accounts Receivable: | $5,000 | $500 |
| Business Personal Property: | $5,000 | $5,000 |
| Computers: | $500 | $5,000 |
| Extra Expense: | $5,000 | $500 |
| Newly Acquired Property | | |
| Any one item: | $25,000 | $500 |
| All items combined: | $50,000 | $500 |
| Property Rented or Leased to Others: | $5,000 | $500 |
| Rental Reimbursement: | $5,000 | $500 |
| Valuable Records Research: | $5,000 | $500 |

| Name of Insured | Policy Number CR04506093 | **Effective Date** 05/24/02 |
|---|---|---|
| RAYMOND MANZAREK | | Processing Date 10/03/02  17:40  001 |

10051 Ed. 12-97 Printed in U.S.A.
©St Paul Fire and Marine Insurance Co 1997 All Rights Reserved

Coverage Summary

Page 1 of 2

Exhibit _A_
Page _40_

 The St Paul

### Scheduled Property

Scheduled Property must include all mobile recording/broadcasting studio vehicles and permanently attached equipment to be covered.

| Item Number | Description<br>Give mfg.'s name, model, serial number, where applicable | Limits Of Coverage |
|---|---|---|
| | | |

### Named Endorsement Table

**Important Note:** Only endorsements that must have certain information shown for them to apply are named in this table. The required information follows the name of each such endorsement. Other endorsements may apply too. If so, they're listed on the Policy Forms List.

©St.Paul Fire and Marine Insurance Co.1997 All Rights Reserved

Exhibit _A_
Page _41_

COMMERCIAL GENERAL LIABILi,, PROTECTION                              The **St Paul**

This insuring agreement provides general
liability protection for your business. There
are, of course, limitations and exclusions
throughout this agreement that apply to that
protection. As a result, this agreement
should be read carefully to determine the
extent of the coverage provided to you and
other protected persons.

## Table of Contents

| | Page |
|---|---|
| **What This Agreement Covers** | 1 |
| Bodily injury and property damage liability. | 1 |
| Personal injury liability. | 3 |
| Advertising injury liability. | 4 |
| Medical expenses. | 4 |
| Right and duty to defend a protected person. | 4 |
| Additional payments. | 5 |
| Right to appeal a judgment against a protected person. | 6 |
| **When This Agreement Covers** | 6 |
| Bodily injury and property damage liability. | 6 |
| Personal injury liability. | 6 |
| Advertising injury liability. | 6 |
| Medical expenses. | 6 |
| **Where This Agreement Covers** | 6 |
| **Who Is Protected Under This Agreement** | 7 |
| Individual. | 7 |
| Partnership or joint venture. | 7 |
| Limited liability company. | 7 |
| Corporation or other organization. | 7 |
| Employees and volunteer workers. | 7 |
| Real estate managers. | 8 |
| Landlords. | 9 |
| Equipment lessors. | 9 |
| Operators of registered mobile equipment. | 9 |
| Newly acquired or formed organizations. | 9 |
| Separation of protected persons. | 9 |
| **Limits Of Coverage** | 9 |
| General total limit. | 10 |
| Products and completed work total limit. | 10 |
| Personal injury each person limit. | 11 |
| Advertising injury each person limit. | 11 |
| Each event limit. | 12 |
| How the limits of coverage apply if a total limit is left blank. | 12 |
| **Exclusions – What This Agreement Won't Cover** | 12 |
| Advertising, broadcasting, or publishing business. | 12 |
| Aircraft. | 12 |
| Auto. | 13 |
| Breach of contract. | 14 |
| Contract liability. | 14 |
| Control of property. | 16 |
| Damage to your products or completed work. | 17 |
| Deliberately breaking the law. | 17 |
| Employers liability. | 17 |
| Expected or intended bodily injury or property damage. | 18 |
| False material. | 18 |
| Impaired property. | 18 |
| Intellectual property. | 18 |
| Liquor liability. | 19 |
| Material previously made known or used. | 19 |
| Medical expenses of certain persons. | 19 |
| Mobile equipment. | 20 |
| Nuclear energy liability. | 20 |
| Pollution injury or damage. | 22 |
| Pollution work loss, cost, or expense. | 24 |
| Poor quality or performance. | 25 |
| Product recall. | 25 |
| Unnamed partnership, joint venture, or limited liability company. | 25 |
| Watercraft. | 25 |
| Workers compensation and other benefits laws. | 26 |
| Wrong price description. | 26 |
| **Other Insurance** | 26 |
| Primary or excess other insurance. | 26 |
| When this agreement is excess insurance. | 26 |
| Methods of sharing. | 27 |

## What This Agreement Covers

**Bodily injury and property damage liability.**
We'll pay amounts any protected person is
legally required to pay as damages for
covered bodily injury or property damage
that:

Exhibit _A_
Page _42_

The St Paul

- happens while this agreement is in effect; and
- is caused by an event.

*Protected person* means any person or organization that qualifies as a protected person under the Who Is Protected Under This Agreement section.

*Bodily injury* means any physical harm, including sickness or disease, to the physical health of other persons.

We'll consider any of the following that happens at any time to be part of such physical harm, sickness, or disease, if it results in or from such physical harm, sickness, or disease:

- Mental anguish, injury, or illness.
- Emotional distress.
- Care, loss of services, or death.

We'll consider any bodily injury that's a continuation, change, or resumption of previously known bodily injury to happen before this agreement begins if such continuation, change, or resumption would otherwise be covered by this agreement because of a continuous, multiple, or other coverage trigger required under the law that applies.

Of course, if there's a continuation, change, or resumption, after this agreement ends, of bodily injury that:

- isn't previously known bodily injury; and
- happens while this agreement is in effect;

we'll consider such continuation, change, or resumption to also happen while this agreement is in effect if that would be the result because of a continuous, multiple, or other coverage trigger required under the law that applies.

*Previously known bodily injury* means bodily injury that happened before this agreement begins and was known by you or any described individual protected person before this agreement begins as a result of any of the following at that time:

- You or any described individual protected person reporting all or part of that bodily injury to us or any other insurer.
- You or any described individual protected person receiving a claim or suit for all or part of that bodily injury.

- Any described individual protected person witnessing, or being told of, the beginning, or any change, continuation, or resumption, of all or part of that bodily injury.

*Described individual protected person* means any of the following:

- You or your spouse if you are an individual.
- Any of your partners or co-venturers that are individuals, or their spouses, if you are a partnership or joint venture.
- Any of your members or managers if you are a limited liability company.
- Any of your directors or executive officers if you are a corporation or other organization.
- Any of your employees who is or acts as your insurance or risk manager or holds a position in your insurance, risk management, or legal department.

*Property damage* means:

- physical damage to tangible property of others, including all resulting loss of use of that property; or
- loss of use of tangible property of others that isn't physically damaged.  For example:

  *One of your employees accidentally causes a fire in your premises.  The fire department responds and orders nearby businesses to close for safety reasons while it fights the fire.  Your premises is heavily damaged by the fire.  But none of the nearby businesses are physically damaged.  As a result, we'll consider the period of time those businesses are closed due to your fire to be loss of use of tangible property of others that isn't physically damaged.*

We'll consider all physical damage to tangible property of others that's a continuation, change, or resumption of previously known physical damage to tangible property of others to happen before this agreement begins if such continuation, change, or resumption would otherwise be covered by this agreement because of a continuous, multiple, or other coverage trigger required under the law that applies.

Of course, if there's a continuation, change, or resumption, after this agreement ends, of

Exhibit *A*
Page *48*

The St.Paul

physical damage to tangible property of others that:

* isn't previously known physical damage to tangible property of others; and
* happens while this agreement is in effect;

we'll consider such continuation, change, or resumption to also happen while this agreement is in effect if that would be the result because of a continuous, multiple, or other coverage trigger required under the law that applies.

We'll consider all loss of use of:

* damaged tangible property to happen at the time of the physical damage that caused it; and
* undamaged tangible property to happen at the time of the event that caused it.

*Previously known physical damage to tangible property of others* means physical damage to tangible property of others that happened before this agreement begins and was known by you or any described individual protected person before this agreement begins as a result of any of the following at that time:

* You or any described individual protected person reporting all or part of that property damage to us or any other insurer.
* You or any described individual protected person receiving a claim or suit for all or part of that property damage.
* Any described individual protected person witnessing, or being told of, the beginning, or any change, continuation, or resumption, of all or part of that property damage.

*Event* means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

We explain the terms:

* claim and suit in the Right and duty to defend a protected person section;
* executive officer and other organization in the Corporation or other organization section; and
* employee in the Employees and volunteer workers section.

**Personal injury liability.** We'll pay amounts any protected person is legally required to

pay as damages for covered personal injury that:

* results from your business activities; and
* is caused by a personal injury offense committed while this agreement is in effect.

*Personal injury* means injury, other than bodily injury or advertising injury, that's caused by a personal injury offense.

*Personal injury offense* means any of the following offenses:

* False arrest, detention, or imprisonment.
* Malicious prosecution.
* Wrongful entry into, or wrongful eviction from, a room, dwelling, or premises that a person occupies, if such entry or eviction is committed by or for the landlord, lessor, or owner of that room, dwelling, or premises.
* Invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies, if such invasion is committed by or for the landlord, lessor, or owner of that room, dwelling, or premises.
* Libel, or slander, in or with covered material.
* Making known to any person or organization covered material that disparages the business, premises, products, services, work, or completed work of others.
* Making known to any person or organization covered material that violates a person's right of privacy.

*Covered material* means any material in any form of expression, including material made known in or with any electronic means of communication, such as the Internet.

But we won't consider the following to be covered material:

* Any website, part of a website, or content of a website, that's designed, built, maintained, or determined for others by or for any protected person whose business is designing, building, or maintaining, or determining the content of, websites for others.
* Any material made known in an electronic chatroom or bulletin board over which any protected person exercises control, or that any protected person hosts or owns.

Exhibit *A*
Page *44*

The St.Paul

**Advertising injury liability.** We'll pay amounts any protected person is legally required to pay as damages for covered advertising injury that:

- results from the advertising of your products, your work, or your completed work; and
- is caused by an advertising injury offense committed while this agreement is in effect.

We won't consider advertising, borders, or frames for or of others, or links for or to others, that are on or in your website to be advertising of your products, your work, or your completed work.

*Advertising injury* means injury, other than bodily injury or personal injury, that's caused by an advertising injury offense.

*Advertising injury offense* means any of the following offenses:

- Libel, or slander, in or with covered material.
- Making known to any person or organization covered material that disparages the business, premises, products, services, work, or completed work of others.
- Making known to any person or organization covered material that violates a person's right of privacy.
- Unauthorized use of any advertising idea or advertising material, or any slogan or title, of others in your advertising.

*Advertising* means attracting the attention of others by any means for the purpose of:

- seeking customers or supporters; or
- increasing sales or business.

*Advertising idea* means a manner or style of advertising that others use and intend to attract attention in their advertising.

But we won't consider information used to identify or record customers or supporters, such as a list of customers or supporters, to be an advertising idea.

*Advertising material* means any covered material that:

- is subject to copyright law; and

others use and intend to attract attention in their advertising.

*Slogan* means a phrase that others use and intend to attract attention in their advertising.

But we won't consider slogan to include a phrase used as, or in, the name of:

- any person or organization, other than you; or
- any business, or any of the premises, products, services, work, or completed work, of any person or organization, other than you.

*Title* means a name of a literary or artistic work.

We explain the terms:

- covered material in the Personal injury liability section; and
- your products, your work, and your completed work in the Products and completed work total limit section.

**Medical expenses.** We'll pay covered medical expenses that result from bodily injury caused by an event that happens while this agreement is in effect, even if the protected person isn't legally required to pay such expenses.

*Medical expenses* means the reasonable expenses incurred by any person or organization for necessary medical services received by a person anytime within three years of the beginning date of an event that causes that person to sustain bodily injury.

*Medical services* includes:

- first aid received at the time of an event;
- ambulance and emergency care services;
- dental, hospital, medical, nursing, surgical, x-ray, and other health care professional services;
- artificial limbs and organs; and
- funeral services.

We explain the term health care professional services in the Employees and volunteer workers section.

**Right and duty to defend a protected person.** We'll have the right and duty to defend any

Exhibit _A_
Page _45_

The St.Paul

protected person against a claim or suit for injury or damage covered by this agreement. We'll have such right and duty even if all of the allegations of the claim or suit are groundless, false, or fraudulent. But we won't have a duty to perform any other act or service.

We'll have the right to investigate any event, offense, claim, or suit to the extent we believe is proper. We'll also have the right to settle any claim or suit within:

- any applicable deductible; or
- the available limits of coverage.

Our duty to defend protected persons ends when we have used up the limits of coverage that apply with the payment of:

- judgments;
- settlements; or
- medical expenses.

*Claim* means a demand that seeks damages.

*Suit* means a civil proceeding that seeks damages. It includes:

- an arbitration proceeding for damages to which the protected person must submit, or submits with our consent; and
- any other alternative dispute resolution proceeding for damages to which the protected person submits with our consent.

*Injury or damage* means:

- bodily injury, personal injury, or advertising injury; or
- property damage.

*Offense* means any:

- personal injury offense; or
- advertising injury offense.

**Additional payments.** We'll have the duty to make only the additional payments shown below in connection with any claim or suit under this agreement against a protected person when we:

- investigate or settle the claim or suit; or
- defend the protected person against the claim or suit.

These payments are in addition to the limits of coverage.

Our duty to make additional payments ends when we have used up the limits of coverage that apply with the payment of:

- judgments;
- settlements; or
- medical expenses.

*Our expenses.* We'll pay all expenses we incur.

*Bail bonds.* We'll pay up to $2,500 of the cost of bail bonds that are required because of accidents or violations of traffic laws. But only if the accidents or violations result from the use of a vehicle to which this agreement applies. We don't have to furnish such bonds.

*Bonds to release property.* We'll pay the cost of bonds to release property that's being used to secure a legal obligation. But only for bond amounts within the available limit of coverage. We don't have to furnish such bonds.

*Expenses incurred by protected persons.* We'll pay all reasonable expenses that any protected person incurs at our request while helping us investigate or settle, or defend a protected person against, a claim or suit. But we won't pay more than $500 per day for earnings actually lost by the protected person because of time taken off from work.

*Taxed costs.* We'll pay all costs taxed against any protected person for covered injury or damage in a suit.

*Prejudgment interest.* We'll pay the interest that accumulates before a judgment and is awarded against the protected person on that part of a judgment we pay. But if we make a settlement offer to pay the available limit of coverage, we won't pay the prejudgment interest that accumulates after the date of our offer.

*Postjudgment interest.* We'll pay all interest that accumulates on the full amount of that part of a judgment for which we make a payment. But only from the date of the judgment to the date we pay, or deposit in court, the limit of coverage that applies to the judgment.

---

Exhibit _A_
Page _2/10_


The St Paul

*Appeal bonds.* If we have the duty to appeal a judgment that includes damages covered by this agreement, and you agree we can appeal that judgment, we'll pay the cost of any appeal bond required for that appeal. But only for that part of the judgment that is for damages covered by this agreement and is within the available limit of coverage. However, we'll pay, or reimburse the protected person, for the cost of a higher appeal bond amount if we're required to do so under the law that applies. But we won't be the principal under any such bond. Nor do we have to furnish any appeal bond. The results of an appeal won't change the limits of coverage that apply under this agreement.

**Right to appeal a judgment against a protected person.** We'll have the right to appeal a judgment that we don't have a duty to appeal. But only if the judgment:

- includes damages for injury or damage covered by this agreement;
- is awarded in a suit for which we defend a protected person; and
- is awarded against the protected person.

If we appeal such a judgment, we'll pay the following that result directly from that appeal:

- All expenses we incur.
- All reasonable expenses that any protected person incurs at our request while helping us with the appeal, other than the cost of appeal bonds.
- The cost of any required appeal bond. But only for that part of the judgment that is for damages covered by this agreement and is within the available limit of coverage. However, we'll pay, or reimburse the protected person, for the cost of a higher appeal bond amount if we're required to do so under the law that applies. But we won't be the principal under any such bond. Nor do we have to furnish any appeal bond.
- All postjudgment interest that accumulates on the full amount of the judgment. But only from the date of the judgment to the date we pay, or deposit in court, the limit of coverage that applies to the judgment.

These payments are in addition to the limits of coverage. However, the results of an appeal won't change the limits of coverage that apply under this agreement.

**When This Agreement Covers**

**Bodily injury and property damage liability.** We'll apply this agreement to claims or suits for covered bodily injury or property damage whenever they're made or brought.

**Personal injury liability.** We'll apply this agreement to claims or suits for covered personal injury whenever they're made or brought.

**Advertising injury liability.** We'll apply this agreement to claims or suits for covered advertising injury whenever they're made or brought.

**Medical expenses.** We'll apply this agreement to covered medical expenses only when they're reported to us within three years of the beginning date of the event.

**Where This Agreement Covers**

We'll apply, and make payments under, this agreement:

- only in the coverage territory; and
- only for covered injury or damage that's caused by events that happen, or offenses that are committed, there.

However, we'll also apply, and make payments under, this agreement in the coverage territory for covered injury or damage that's caused by events which happen, or offenses which are committed, in the rest of the world if the protected person's liability for such injury or damage is determined in a suit on the merits in the coverage territory, or in a settlement agreed to by us, and:

- the events or offenses result from the activities of a person whose home is in the coverage territory, but is away from there for a short time on your business;
- the events result from your products that are made or sold by you in the coverage territory; or
- the offenses are committed in or with any electronic means of communication, such as the Internet.

For example:

Exhibit ___A___
Page ___47___

The St Paul

*You manufacture a product in the coverage territory. It is exported to Norway. A few months later a Norwegian citizen is allegedly injured while using that product and, as a result, sues you. If the suit is brought against you in the coverage territory, and it seeks damages for bodily injury covered by this agreement, we'll have the duty to defend you against the suit and pay covered damages awarded in a judgment against you. However, if the suit is brought against you in Norway, or anywhere else outside of the coverage territory, we won't have a duty to defend you there. Also, we won't have a duty to pay a judgment awarded by a court there, even if the judgment is later recognized and enforced by a court in the coverage territory.*

*Coverage territory* means:

- the United States of America, including its territories and possessions;
- Puerto Rico;
- Canada; and
- international waters or airspace only during travel or transportation between any of the above places.

We explain the term your products in the Products and completed work total limit section.

## Who Is Protected Under This Agreement

**Individual.** If you are shown in the Introduction as a named insured and an individual, you and your spouse are protected persons only for the conduct of a business of which you are the sole owner.

**Partnership or joint venture.** If you are shown in the Introduction as a named insured and a partnership or a joint venture, you are a protected person. Your partners or co-venturers, and their spouses, are protected persons only for the conduct of your business.

**Limited liability company.** If you are shown in the Introduction as a named insured and a limited liability company, you are a protected person. Your members are protected persons only for the conduct of your business. And your managers are

protected persons only for their duties as your managers.

**Corporation or other organization.** If you are shown in the Introduction as a named insured and a corporation or an other organization, you are a protected person. Your directors and executive officers are protected persons only for the conduct of their duties as your directors or executive officers. And your stockholders are protected persons only for their liability as your stockholders.

*Other organization* means an organization other than a corporation, partnership, joint venture, or limited liability company.

*Executive officer* means any person holding an officer position created by the charter, constitution, or by-laws, or any other similar governing document, of a corporation or other organization.

**Employees and volunteer workers.** Your employees are protected persons only for:

- work done within the scope of their employment by you; or
- their performance of duties related to the conduct of your business.

And your volunteer workers are protected persons only for activities or work they conduct or perform:

- at your direction; and
- within the scope of their duties for you.

However, no employee or volunteer worker is a protected person for bodily injury or personal injury to:

- you;
- any of your partners or co-venturers if you are a partnership or joint venture;
- any of your members or managers if you are a limited liability company;
- any fellow employee;
- any fellow volunteer worker or any of your employees; or
- the spouse, or any child, parent, brother, or sister, of that employee or volunteer worker if such injury results from the bodily injury or personal injury to such fellow employee or volunteer worker.

47500 Rev. 1-01 Printed in U.S.A.
©St.Paul Fire and Marine Insurance Co. 2001 All Rights Reserved

Insuring Agreement

Page 7 of 27

Exhibit _____ A

Page _____ 48

**The St.Paul**

Nor is any employee or volunteer worker a protected person for:

- any obligation to share damages with or repay someone else who must pay damages because of such bodily injury or personal injury; or
- bodily injury or personal injury that results from his or her performance of or failure to perform health care professional services.

Also, no employee or volunteer worker is a protected person for property damage to property that's controlled by:

- you;
- any of your partners or co-venturers if you are a partnership or joint venture;
- any of your members or managers if you are a limited liability company;
- that employee or any fellow employee; or
- that volunteer worker, any fellow volunteer worker, or any of your employees.

But we won't apply the exclusions in this Employees and volunteer workers section to:

- bodily injury that results from the providing of or failure to provide first aid by an employee or volunteer worker, other than an employed or volunteer doctor; or
- premises damage.

Nor will we apply this Employees and volunteer workers section to the following protected persons:

- Your managers if you are a limited liability company. Instead, we'll apply the Limited liability company section to them.
- Your executive officers if you are a corporation or an other organization. Instead, we'll apply the Corporation or other organization section to them.

*Employee* includes a leased worker, other than a leased temporary worker.

*Leased worker* means any person who:

- is hired from an employee leasing firm under a contract or agreement between the hirer and that firm; and
- is performing duties related to the conduct of the hirer's business.

*Volunteer worker* means any person who:

- isn't an employee or a leased temporary worker;
- donates his or her work; and
- isn't paid a fee, salary, or other compensation for that work.

*Employee leasing firm* means any person or organization that hires out workers to others. It includes any:

- employment agency, contractor, or service;
- labor leasing firm; or
- temporary help service.

*Leased temporary worker* means a leased worker who is hired to:

- temporarily take the place of a permanent employee on leave; or
- meet seasonal or short-term workload conditions.

*Controlled by* means:

- owned, rented, leased, occupied, borrowed, or used by;
- in the care, custody, or control of; or
- being physically controlled for any purpose by.

*Health care professional services* includes:

- any dental, medical, mental, nursing, surgical, x-ray, or other health care professional service, including any advice, instruction, food, or beverage provided with such service;
- the dispensing of drugs or medical or dental supplies and appliances; and
- the handling or treatment of corpses, including autopsies, organ donations, and other postmortem procedures.

We explain the term premises damage in the Each event limit section.

**Real estate managers.** Your real estate managers are protected persons only for their management of premises that you rent, lease, or borrow from others, or own. They may be persons or organizations.

But we won't apply this Real estate managers section to your employees. Instead, we'll apply the Employees and volunteer workers section to them.

Exhibit _A_
Page _49_

The St.Paul

**Landlords.** Any landlord, lessor, manager, or owner of a premises rented or leased to you is a protected person only for the ownership, maintenance, or use of that premises while you rent or lease it.

However, no landlord, lessor, manager, or owner is a protected person for injury or damage that results from any of the following work while being done by or for such landlord, lessor, manager, or owner:

* Structural changes.
* New construction work.
* Demolition work.

But we won't apply this Landlords section to your real estate managers. Instead, we'll apply the Real estate managers section, or the Employees and volunteer workers section, whichever section is applicable, to them.

**Equipment lessors.** Any lessor or owner of equipment rented or leased to you is a protected person only for your operation, maintenance, or use of that equipment while you rent or lease it.

However, no equipment lessor or owner is a protected person for injury or damage that results from its sole negligence.

**Operators of registered mobile equipment.** All operators of registered mobile equipment are protected persons for covered bodily injury or property damage that results from their driving of such equipment on a public street or road with your permission.

Any person or organization legally responsible for the driving conduct of those operators is also a protected person for such bodily injury or property damage. But only if there's no valid and collectible other insurance available to cover its liability for the operators.

However, no operator or any other person or organization is a protected person for:

* bodily injury to a fellow employee of the person driving the equipment; or
* property damage to property controlled by you or the employer of an operator who is a protected person.

*Registered mobile equipment* means mobile equipment that's registered in your name under a motor vehicle registration law.

We explain the terms:

* controlled by in the Employees and volunteer workers section;
* mobile equipment in the Mobile equipment exclusion; and
* other insurance in the Other insurance section.

**Newly acquired or formed organizations.** Any organization that you acquire or form while this agreement is in effect that isn't a partnership, joint venture, or limited liability company is a protected person if you own more than 50% of it.

However, no newly acquired or formed organization is a protected person for:

* more than 180 days, or the remainder of the time this agreement is in effect, whichever period is shorter, from the date you acquire or form it, unless we agree it should continue to be a protected person after the end of that period of time;
* bodily injury or property damage that happened before you acquired or formed it;
* personal injury or advertising injury that results from an offense committed before you acquired or formed it; or
* injury or damage that's covered by other similar general liability insurance.

**Separation of protected persons.** We'll apply this agreement separately to each protected person.

However, all protected persons share the limits of coverage shown in the Coverage Summary. We explain how in the Limits Of Coverage section.

Also, any right or duty specifically assigned to the first named insured remains unchanged. We explain those rights and duties in the General Rules, which is a part of your policy.

## Limits Of Coverage

The limits of coverage shown in the Coverage Summary and the information

Exhibit __A__
Page __50__

The St.Paul

contained in this section fix the most we'll pay as damages and medical expenses, regardless of the number of:

* protected persons;
* claims made or suits brought; or
* persons or organizations making claims or bringing suits.

**General total limit.** This is the most we'll pay for the combined total of:

* all covered bodily injury and property damage that happens in a policy year;
* all covered personal injury that's caused by all personal injury offenses committed in a policy year;
* all covered advertising injury that's caused by all advertising injury offenses committed in a policy year; and
* all covered medical expenses that result from all events that happen in a policy year.

However, we won't apply this limit to bodily injury or property damage that results from your products or your completed work. Instead, we'll apply the products and completed work total limit to such bodily injury or property damage covered by this agreement.

*Policy year* means the policy period shown in the Introduction, or the period of time that this agreement is in effect, whichever period is shorter. But when that period is longer than one year, policy year means each of the following periods of time that this agreement is in effect, starting with the beginning date of this agreement:

* Each consecutive one-year period.
* Any period that remains after the last consecutive one-year period.

However, if the original policy period shown in the Introduction is extended for a period of less than one year, we'll consider each such extended period to be part of the last policy year, regardless of the number of extensions provided.

For example:

*Your original policy period is two years and nine months long. As a result, it has three policy years, each one separate from the other. The first is the first one-year period. The second is the next one-year*

*period. And the third is the remaining nine-month period.*

*During the third policy year you request, and we provide, two separate extensions of the policy period: a three-month extension, and then a four-month extension. As a result, the third policy year becomes sixteen months long and is still subject to the same limits of coverage that applies when it was nine months long.*

We explain the products and completed work total limit, and the terms your products and your completed work, in the Products and completed work total limit section.

**Products and completed work total limit.** This is the most we'll pay for all covered bodily injury and property damage that:

* results from your products and your completed work; and
* happens in a policy year.

*Your products* means any of the goods or products that are or were manufactured, sold, handled, distributed, or disposed of by:

* you;
* others using your name; or
* any person or organization whose business or assets you've acquired.

Your products includes:

* all containers, equipment, materials, or parts provided with or for your products;
* any warranty provided with or for your products;
* any statement made, or that should have been made, about the durability, fitness, handling, maintenance, operation, performance, quality, safety, or use of your products; and
* all warnings, instructions, or directions provided, or that should have been provided, with or for your products.

But we won't consider the following to be your products:

* Goods or products that are still in your physical possession or on a premises that you rent, lease, or borrow from others, or own.
* Real property.

©St.Paul Fire and Marine Insurance Co. 2001 All Rights Reserved

Exhibit ___A___
Page ___51___

The St.Paul

● Containers that are vehicles provided with or for your products.
● Property that's rented or leased to others.
● Property that you haven't sold, but which you allow others to use. For example, a vending machine.

*Your completed work* means your work that:
● is completed, including work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete; or
● has been abandoned by you.

We'll consider your work to be completed at the earliest of the following times:
● When all of the work called for in your contract has been completed.
● When all of the work to be done at the work site has been completed, if your contract calls for work at more than one site.
● When that part of the work at the work site has been put to its intended use by any person or organization, other than another contractor or subcontractor working on the same project.

Your completed work includes:
● any warranty provided with or for your completed work;
● any statement made, or that should have been made, about the durability, fitness, handling, maintenance, operation, performance, quality, safety, or use of your completed work; and
● all warnings, instructions, or directions provided, or that should have been provided, with or for your completed work.

But we won't consider the following to be your completed work:
● Uninstalled equipment, abandoned or unused materials or parts, or tools.
● Work done in connection with transporting property.
● Any premises or other real property that you own.
● Any work done to a premises or other real property that you rent or lease from others, or own.

● Any work while on a premises that you rent, lease, or borrow from others, or own.

However, we'll consider a condition created in or on a vehicle in the course of work done in connection with transporting property to be your completed work if:
● the vehicle isn't owned or operated by you;
● the condition is created by the loading or unloading of the vehicle by a protected person; and
● the condition causes bodily injury or property damage.

*Your work* means any:
● work that you're performing or others are performing for you; or
● service that you're providing or others are providing for you.

Your work includes:
● all equipment, materials, parts, or tools being provided or used with or for your work;
● any statement being made, or that should have been made, about the durability, fitness, handling, maintenance, operation, performance, quality, safety, or use of your work; and
● all warnings, instructions, or directions being provided, or that should have been provided, with or for your work.

We explain the term loading or unloading in the Auto exclusion.

**Personal injury each person limit.** This is the most we'll pay for all covered personal injury that:
● is sustained by any one person or organization; and
● is caused by all personal injury offenses committed in a policy year.

**Advertising injury each person limit.** This is the most we'll pay for all covered advertising injury that:
● is sustained by any one person or organization; and
● is caused by all advertising injury offenses committed in a policy year.

Exhibit ___A___
Page ___52___

The **St.Paul**

**Each event limit.** This is the most we'll pay for all covered bodily injury, property damage, and medical expenses that result from any one event.

However, the most we'll pay for covered premises damage or medical expenses that result from any one event is further limited by the following:

*Premises damage limit.* This is the most we'll pay for all covered premises damage that's caused by any one event.

*Premises damage* means property damage to:

* any premises that you rent, lease, or borrow from others; or
* the contents of any premises that you rent from others if you rent such premises for a period of seven or fewer consecutive days.

*Medical expenses limit.* This is the most we'll pay for all covered medical expenses that:

* are incurred for bodily injury sustained by any one person; and
* result from any one event.

**How the limits of coverage apply if a total limit is left blank.** If the amount of the general total limit or the products and completed work total limit is left blank in the Coverage Summary, we'll consider that total limit to be the same as the each event limit or $200,000, whichever amount is more.

**Exclusions – What This Agreement Won't Cover**

**Advertising, broadcasting, or publishing business.** We won't cover personal injury that results from any of the following personal injury offenses committed by or for any protected person whose business is advertising, broadcasting, or publishing, if such offense is committed in any advertising, broadcasting, or publishing done by or for that protected person:

* Libel, or slander, in or with covered material.
* Making known to any person or organization covered material that disparages the business, premises,

products, services, work, or completed work of others.
* Making known to any person or organization covered material that violates a person's right of privacy.

Nor will we cover advertising injury that results from an offense committed by or for any protected person whose business is advertising, broadcasting, or publishing.

We won't consider the placement of advertising, borders, or frames for or of others, or links for or to others, on or in a protected person's website, by itself, to mean that protected person's business is advertising.

*Broadcasting* means transmitting any audio or visual material for any purpose:

* by radio or television; or
* in or with any other electronic means of communication, such as the Internet, if that material is part of radio or television programming, other entertainment, music, or news programming, or advertising transmitted with that programming.

*Publishing* means creating and producing any material in any format for distribution or sale to others for any purpose.

But we won't consider creating and producing any of the following material in any format to be publishing:

* Correspondence written in the conduct of your business.
* Material, including bulletins, financial or annual reports, or newsletters, that describes or reports your business activities, your products, your work, or your completed work.

We explain the terms your products, your work, and your completed work in the Products and completed work total limit section.

**Aircraft.** We won't cover bodily injury, property damage, or medical expenses that result from the:

* ownership, maintenance, use, or operation;
* loading or unloading;
* entrustment to others; or

Exhibit A
Page 53

The St Paul

- supervision of others in or for the maintenance, use, operation, loading or unloading, or entrustment to others;

of any aircraft owned, operated, rented, leased, or borrowed by any protected person.

But we won't apply this exclusion to the liability of another to pay damages for bodily injury or property damage if you have assumed such liability under a covered contract that:

- is for the ownership, maintenance, or use of an aircraft; and
- was made before the bodily injury or property damage happens.

Nor will we apply this exclusion to:

- bodily injury, property damage, or medical expenses that result from the operation of specialized equipment; or
- premises damage.

Also, we won't apply this exclusion to bodily injury, property damage, or medical expenses that result from the use of an aircraft chartered by a protected person if:

- the aircraft is chartered with crew, including a pilot; and
- the protected person isn't using the aircraft to carry persons or property for a charge.

We explain the terms:

- covered contract in the Contract liability exclusion;
- entrustment to others, loading or unloading, and supervision of others, in the Auto exclusion;
- premises damage in the Each event limit section; and
- specialized equipment in the Mobile equipment exclusion.

**Auto.** We won't cover bodily injury, property damage, or medical expenses that result from the:

- ownership, maintenance, use, or operation;
- loading or unloading;
- entrustment to others; or
- supervision of others in or for the maintenance, use, operation, loading or unloading, or entrustment to others;

of any auto owned, operated, rented, leased, or borrowed by any protected person.

But we won't apply this exclusion to bodily injury, property damage, or medical expenses that result from the parking of an auto on a premises, or on the ways next to such premises, if:

- the premises is owned, rented, leased, or borrowed by you; and
- the auto isn't owned, rented, leased, or borrowed by any protected person.

Nor will we apply this exclusion to:

- bodily injury, property damage, or medical expenses that result from the operation of specialized equipment; or
- premises damage.

*Auto* means any land motor vehicle, trailer, or semitrailer that's designed for travel on public streets or roads.

We'll consider any machinery or equipment that's permanently attached to an auto to be part of the auto.

But we won't consider mobile equipment to be an auto.

*Loading or unloading* means the handling of property:

- while it's being moved from the place where it's accepted for transportation;
- while it's being loaded, transported, and unloaded; and
- until it's moved to the place where it's finally delivered.

But we won't consider moving property by an unattached mechanical device to be loading or unloading.

*Unattached mechanical device* includes any forklift, conveyor, or other unattached mechanical device, other than a hand truck.

*Entrustment to others* means:

- the permitting of others to use or do something; or
- the giving of something to others for safekeeping.

*Supervision of others* means:

---

Insuring Agreement

Exhibit _____ A

Page _____ 54

The St.Paul

- the directing, managing, or supervising of a worker, including his or her employment, hiring, evaluation, training, or work; or

- the directing, monitoring, safekeeping, or supervising of any other person or organization for any reason.

We explain the terms:

- mobile equipment and specialized equipment in the Mobile equipment exclusion; and

- premises damage in the Each event limit section.

**Breach of contract.** We won't cover personal injury or advertising injury that results from the failure of any protected person to do what is required by a contract or agreement.

But we won't apply this exclusion to advertising injury that results from the unauthorized use of any advertising idea of others in your advertising if such use isn't specifically prohibited by the contract or agreement.

**Contract liability.** We won't cover injury or damage for which the protected person has assumed liability under any contract or agreement.

But we won't apply this exclusion to injury or damage for which the protected person would have liability without the contract or agreement.

Nor will we apply this exclusion to the liability of another to pay damages for:

- bodily injury or property damage sustained by others if you have assumed such liability under a covered contract made before the bodily injury or property damage happens; or

- personal injury or advertising injury sustained by others if you have assumed such liability under a covered contract made before the offense that causes such injury is committed.

Also, if you have agreed under the same covered contract to defend, or pay for the defense of, an indemnitee against a claim or suit for such injury or damage covered by this agreement, we'll defend the indemnitee against the claim or suit. But we'll do so because of that covered contract only if:

- that indemnitee isn't a protected person for that injury or damage;

- that claim or suit is for injury or damage for which you have assumed the liability of the indemnitee under the covered contract;

- the injury or damage is covered by this agreement;

- the claim or suit is made or brought against you and the indemnitee;

- we are defending you against the claim or suit under this agreement;

- all of our indemnitee defense control and authority requirements are fulfilled; and

- all of our indemnitee defense cooperation and notice requirements are fulfilled.

When we provide that contract liability indemnitee defense coverage, we'll do the following:

- We'll defend the indemnitee even if all of the allegations of the claim or suit are groundless, false, or fraudulent. But we won't have a duty to perform any other act or service.

- We'll pay all covered indemnitee defense expenses incurred by us in connection with such claim or suit. Such payments are in addition to the limits of coverage.

However, our duty to defend the indemnitee, or pay indemnitee defense expenses incurred by us, under that contract liability indemnitee defense coverage ends when that indemnitee fails to comply with any of our indemnitee defense cooperation and notice requirements. It also ends when we have used up the limits of coverage that apply with the payment of:

- judgments;

- settlements; or

- medical expenses.

When we don't provide that contract liability indemnitee defense coverage for the indemnitee, we'll pay covered indemnitee defense expenses assumed under contract that:

- are incurred by or for that indemnitee; and

- are awarded against you in a judgment or agreed to by us in a settlement;

as if they're amounts you're legally required to pay as damages for injury or damage covered by this agreement. Payments of such amounts are subject to the limits of

Exhibit _A_
Page _55_

The St.Paul

coverage. Our duty to make such payments ends when we have used up the limits of coverage that apply with the payment of:

* judgments;
* settlements; or
* medical expenses.

We'll have the right to appeal a judgment awarded in a suit against an indemnitee if:

* the judgment includes damages for injury or damage for which you have assumed liability under a covered contract;
* such injury or damage is covered by this agreement;
* the indemnitee and its insurers don't appeal the judgment; and
* you agree we may seek the cooperation of that indemnitee for such an appeal.

If we appeal such a judgment, we'll pay the following that result directly from that appeal:

* All expenses we incur.
* All reasonable expenses that any protected person and the indemnitee incur at our request while helping us with the appeal, other than the cost of appeal bonds.
* The cost of any required appeal bond. But only for that part of the judgment that is for damages covered by this agreement and is within the available limit of coverage. However, we'll pay, or reimburse the indemnitee, for the cost of a higher appeal bond amount if we're required to do so under the law that applies. But we won't be the principal under any such bond. Nor do we have to furnish any appeal bond.
* All postjudgment interest that accumulates on the full amount of the judgment. But only from the date of the judgment to the date we pay, or deposit in court, the limit of coverage that applies to the judgment.

These payments are in addition to the limits of coverage. However, the results of an appeal won't change the limits of coverage that apply under this agreement.

*Covered contract* means:

* any easement or license agreement;
* any elevator maintenance agreement;
* any lease of premises, other than that part which indemnifies a person or organization

for property damage to a premises that you rent, lease, or borrow from others;

* any obligation to indemnify a municipality that is required by ordinance and isn't connected with your work for the municipality;
* any sidetrack agreement;
* that part of any other contract or agreement under which you assume the tort liability of a municipality to pay damages for injury or damage that results from your work for the municipality; or
* that part of any other contract or agreement under which you assume the tort liability of another to pay damages for injury or damage.

But we won't consider the following parts of those other contracts or agreements under which you assume the tort liability of another to pay damages to be a covered contract:

* Architect, engineer, or surveyor indemnity.
* Architect, engineer, or surveyor professional services by protected person indemnity.
* War indemnity.

*Tort liability* means a liability that would be imposed by law without any contract or agreement.

*Architect, engineer, or surveyor indemnity* means that part which indemnifies any architect, engineer, or surveyor for injury or damage that results from:

* the preparation or approval of, or failure to prepare or approve, any drawing and specification, or any map, opinion, report, survey, change order, field order, or shop drawing; or
* the giving of or failure to give any direction or instruction if that giving or failure to give is the primary cause of the injury or damage.

*Architect, engineer, or surveyor professional services by protected person indemnity* means that part which indemnifies any person or organization for injury or damage that results from the performance of or failure to perform architect, engineer, or surveyor professional services by the protected person who is an architect, engineer, or surveyor.

---

Exhibit _A_
Page _6 6_

The St.Paul

*Architect, engineer, or surveyor professional services* includes:

- the preparation or approval of any drawing and specification, or any map, opinion, report, survey, change order, field order, or shop drawing; and
- any architectural, engineering, inspection, or supervisory activity.

*War indemnity* means that part which indemnifies any person or organization for bodily injury or property damage that results from war.

*Indemnitee* means any person or organization that you have agreed under a covered contract to indemnify or hold harmless.

*Indemnitee defense control and authority requirements* means the following requirements that must be fulfilled for us to conduct and control the defense of an indemnitee against a claim or suit under this agreement:

- You and the indemnitee must ask us to conduct and control the defense of that indemnitee against the claim or suit under this agreement.
- We must determine that there's no conflict between your interests and those of the indemnitee, based on the allegations in the claim or suit and on what we know about the factual and legal basis for the damages being sought.
- You and the indemnitee must each agree in writing that we can assign the same counsel to defend them.
- The indemnitee must give us authority in writing to conduct and control its defense against the claim or suit.
- The indemnitee must give us authority in writing to obtain records and other information related to the claim or suit.
- The indemnitee must agree in writing to comply with our indemnitee defense cooperation and notice requirements.

*Indemnitee defense cooperation and notice requirements* means the following requirements that must be fulfilled for us to continue defending an indemnitee against a claim or suit under this agreement:

- The indemnitee must cooperate with us in the investigation, settlement, or defense of the claim or suit.
- The indemnitee must provide us with a copy of any demand, notice, summons, or legal paper received in connection with the claim or suit as soon as possible after it is received.
- The indemnitee must give notice of the claim or suit to any other insurer that provides coverage which applies to the claim or suit and is available to that indemnitee.
- The indemnitee must help us coordinate the application of other insurance that's applicable to the claim or suit and available to that indemnitee.

*Indemnitee defense expenses incurred by us* means the:

- attorney fees and necessary litigation expenses incurred by us to defend an indemnitee against a claim or suit for damages covered by this agreement; and
- necessary litigation expenses incurred by that indemnitee at our request in connection with that claim or suit.

*Indemnitee defense expenses assumed under contract* means the reasonable attorney fees and necessary litigation expenses that:

- are incurred by or for an indemnitee to defend itself against a claim or suit for damages covered by this agreement; and
- are subject to a covered contract under which you have agreed to defend, or pay for the defense of, that indemnitee against the claim or suit.

We explain the terms:

- your work in the Products and completed work total limit section;
- war in the Medical expenses of certain persons exclusion; and
- other insurance in the Other Insurance section.

**Control of property.** We won't cover property damage to the following property:

- Property that you rent, lease, or borrow from others, own, or occupy. But we won't apply this exclusion part to premises damage.
- Premises that you sell, give away, or abandon if such property damage results from any part of those premises. But we won't apply this exclusion part to property damage to premises that are your

Exhibit _A_
Page _57_

The St.Paul

completed work and were never occupied, rented, or held for rental by you.

- Personal property that's in the care, custody, or control of the protected person. But we won't apply this exclusion part to premises damage.

- That particular part of real property being worked on by or for you if such property damage results from your work.

- That particular part of any property that must be restored, repaired, or replaced because your work was incorrectly performed on it. But we won't apply this exclusion part to property damage that results from your completed work.

Furthermore, we won't apply this exclusion to the liability of another to pay damages for property damage, other than property damage to the property described below, if you have assumed such liability under a sidetrack agreement made before the property damage happens:

- Property that you rent or lease from others, own, or occupy.

- Premises that you sell, give away, or abandon.

We explain the terms:

- premises damage in the Each event limit section; and

- your work and your completed work in the Products and completed work total limit section.

**Damage to your products or completed work.** We won't cover property damage to any of your products that's caused by your products themselves or by any of their parts. For example:

*You manufacture air conditioners. They contain several moving parts that can break down for many reasons. Regardless of the cause, we won't protect you for any property damage to the part that fails or to the rest of the air conditioner.*

Nor will we cover property damage to your completed work that's caused by your completed work itself or by any of its parts. But we won't apply this exclusion part to such property damage if:

- this agreement provides completed work liability coverage; and

- your completed work that's damaged, or your completed work that causes the property damage, was done for you by others.

For example:

*You construct a building as a general contractor. Some of the work is done by you while the rest is done for you by subcontractors. The building is accepted by the owner. If it's damaged by a fire caused by electrical wiring installed by a subcontractor, we won't apply the exclusion. However, if the wiring was installed by you, we'll apply the exclusion to property damage to your completed work done by you.*

We explain the terms your products and your completed work in the Products and completed work total limit section.

**Deliberately breaking the law.** We won't cover personal injury or advertising injury that results from:

- the protected person knowingly breaking any criminal law; or

- any person or organization breaking any criminal law with the consent or knowledge of the protected person.

**Employers liability.** We won't cover bodily injury to an employee of the protected person arising out of and in the course of his or her:

- employment by the protected person; or

- performance of duties related to the conduct of the protected person's business.

Nor will we cover bodily injury to the spouse, or any child, parent, brother, or sister, of that employee if such bodily injury results from the bodily injury to such employee.

We'll apply this exclusion whether the protected person may be held liable as an employer or in any other capacity, such as a property owner or product manufacturer. For example:

*You manufacture tires. Your employee is injured while driving a company truck equipped with your tires, when one of the*

---

Exhibit _A_

Page _58_

The **StPaul**

*tires blows out resulting in an accident.*
*He receives workers compensation benefits.*
*If he later sues you in your capacity as a*
*manufacturer, alleging that his injury*
*happened because your product was*
*defective, we won't protect you.*

We'll also apply this exclusion to any
obligation of the protected person to share
damages with or repay someone else who
must pay damages because of bodily injury
to any employee of the protected person.
For example:

*Your employee is injured in a printing*
*press accident. She receives workers*
*compensation benefits. Later, she sues the*
*manufacturer of the printing press, alleging*
*that her injury happened because the press*
*didn't have enough guarding devices on it.*
*If the manufacturer in turn sues you,*
*alleging that your faulty maintenance of the*
*press – not the lack of guarding devices –*
*resulted in the employee's injury, we won't*
*protect you.*

But we won't apply this exclusion to the
liability of another to pay damages for
bodily injury if you have assumed such
liability under a covered contract made
before the bodily injury happens.

We explain the terms:

* covered contract in the Contract liability
  exclusion; and
* employee in the Employees and volunteer
  workers section.

**Expected or intended bodily injury or property**
**damage.** We won't cover bodily injury or
property damage that's expected or intended
by the protected person.

Nor will we cover medical expenses that
result from such bodily injury.

But we won't apply this exclusion to bodily
injury, property damage, or medical expenses
that result from the use of reasonable force
to protect people or property.

**False material.** We won't cover personal
injury or advertising injury that results from
false material that:

* was made known by or for the protected
  person; and

* the protected person knew was false when
  it was made known.

**Impaired property.** We won't cover property
damage to impaired property, or to property
that isn't physically damaged, that results
from:

* your products that are faulty or dangerous;
* your completed work that is faulty or
  dangerous; or
* a delay or failure in fulfilling the terms of
  a contract or agreement.

But we won't apply this exclusion to the
loss of use of property, other than your
products or your completed work, that
results from sudden and accidental physical
damage to:

* your products after they've been put to
  their intended use; or
* your completed work after it has been put
  to its intended use.

For example:

*You supply an electric motor to a customer*
*who uses it to power his conveyor. The*
*motor's shaft breaks several days later*
*while he's operating the conveyor. The*
*conveyor isn't damaged, but your customer*
*has extra costs because he's unable to use*
*it until the motor is repaired. If he sues*
*you to recover those costs, we won't apply*
*the exclusion. However, if the customer*
*discovers while hooking the motor up to*
*the conveyor that the motor's shaft is*
*broken, we won't protect you.*

*Impaired property* means tangible property,
other than your products or your completed
work, that can be restored to use by nothing
more than:

* an adjustment, repair, replacement, or
  removal of your products, or your
  completed work, that forms a part of such
  tangible property; or
* your fulfilling the terms of a contract or
  agreement.

We explain the terms your products and
your completed work in the Products and
completed work total limit section.

**Intellectual property.** We won't cover injury or
damage or medical expenses that result from

Exhibit ___A___
Page ___59___

The St.Paul

any actual or alleged infringement or violation of any of the following rights or laws:

- Copyright.
- Patent.
- Trade dress.
- Trade name.
- Trade secret.
- Trademark.
- Other intellectual property rights or laws.

But we won't apply this exclusion to bodily injury or property damage that results from your products or your completed work.

Nor will we apply this exclusion to advertising injury that results from the unauthorized use of any:

- copyrighted advertising material;
- trademarked slogan; or
- trademarked title;

of others in your advertising.

We explain the terms your products and your completed work in the Products and completed work total limit section.

**Liquor liability.** We won't cover bodily injury, property damage, or medical expenses that result from any protected person:

- causing or contributing to the intoxication of any person;
- selling, serving, or furnishing alcoholic beverages to any person under the legal drinking age or under the influence of alcohol; or
- violating any law or regulation applying to the sale, gift, distribution, or use of alcoholic beverages.

However, we'll apply this exclusion only if you're in the business of manufacturing, distributing, selling, serving, or furnishing alcoholic beverages. For example:

*You manufacture office equipment. Each year you host an awards banquet with an open bar for your sales representatives. After this year's banquet an intoxicated guest is involved in an auto accident. The guest and several others are injured. If someone sues you, alleging that your serving of liquor caused the guest's intoxication and involvement in the accident,*

*we won't apply the Liquor liability exclusion because you're not in the business of serving liquor.*

But we won't apply this exclusion to premises damage.

We explain the term premises damage in the Each event limit section.

**Material previously made known or used.** We won't cover personal injury or advertising injury that results from:

- any material that was first made known before this agreement begins; or
- any advertising idea or advertising material, or any slogan or title, of others, whose unauthorized use in your advertising was first committed before this agreement begins.

**Medical expenses of certain persons.** We won't cover medical expenses that are incurred by or for any person:

- injured while qualifying as a protected person, other than your volunteer workers;
- injured while performing work that he or she was hired to do for any protected person, or any tenant of a protected person;
- injured on that part of any premises that you rent or lease from others, or own, and that the injured person normally occupies;
- to whom such medical expenses are payable, or must be provided, as benefits under any workers compensation law, disability benefits law, or similar law;
- injured by your products or your completed work;
- injured due to war; or
- who refuses to be examined as often as we require, within reason, by doctors we choose.

*War* includes:

- declared or undeclared war, or invasion;
- warlike action by a military force or other agents of any government, sovereign, or other authority;
- civil war, insurrection, rebellion, revolution, or seizure of power; or
- anything done to hinder or defend against such actions.

Exhibit _A_

Page _60_

The **St.Paul**

We explain the terms:
- volunteer worker in the Employees and volunteer workers section; and
- your products and your completed work in the Products and completed work total limit section.

**Mobile equipment.** We won't cover bodily injury, property damage, or medical expenses that result from the:
- transportation of mobile equipment by an auto owned, operated, rented, leased, or borrowed by any protected person;
- use of racing mobile equipment; or
- supervision of others in or for such transportation or use.

But we won't apply this exclusion to premises damage.

*Mobile equipment* means any land vehicle that:
- is designed for use primarily off public streets or roads;
- is kept for use only on or next to premises that you rent or lease from others, or own;
- travels on crawler treads;
- is kept primarily for the ready movement of permanently attached construction equipment; or
- doesn't travel under its own power and is kept primarily for the ready movement of permanently attached specialized equipment.

Mobile equipment includes any land vehicle that:
- isn't described above; and
- is kept primarily for purposes other than carrying people or cargo.

But we won't consider such a vehicle to be mobile equipment if it travels under its own power, is operated like an auto during travel on a public street or road, and has permanently attached:
- specialized equipment; or
- equipment designed for snow removal, street cleaning, or street or road maintenance – but not construction or resurfacing.

*Construction equipment* includes any:

- grader, scraper, or roller; or
- power crane, digger, drill, loader, or shovel.

*Specialized equipment* means any:
- cherry picker or similar device used to lift workers;
- pump, generator, or air compressor; or
- other equipment, such as building cleaning, geophysical exploration, lighting, spraying, welding, or well-servicing equipment, that has a built-in pump, generator, or air compressor.

*Racing mobile equipment* means any mobile equipment while being prepared for or used in any:
- prearranged racing, speed, demolition, or stunting contest or activity; or
- practice for such contest or activity.

We explain the terms:
- auto, and supervision of others, in the Auto exclusion; and
- premises damage in the Each event limit section.

**Nuclear energy liability.** We won't cover bodily injury or property damage for which any protected person:
- is also protected under a nuclear energy liability insurance policy; or
- would have been protected under such policy if that policy's limits of coverage hadn't been used up.

Nor will we cover bodily injury or property damage that results from the hazardous properties of nuclear material and for which:
- any person or organization is required by law to maintain financial protection in accordance with the federal Atomic Energy Act or any of its amendments; or
- any protected person is entitled, or would have been entitled had this agreement not been issued, to indemnity from the United States government, or any of its agencies, under any contract or agreement between the government, or any of its agencies, and any person or organization.

Also, we won't cover medical expenses that result from:

©St.Paul Fire and Marine Insurance Co. 2001 All Rights Reserved

Exhibit _____ A

Page _____ 101

The St.Paul

- the hazardous properties of nuclear material; or
- the operation of a nuclear facility by any person or organization.

In addition, we won't cover bodily injury or property damage that results from the hazardous properties of nuclear material when:

- the nuclear material is located at, or at any time discharges or disperses from, a nuclear facility that is or was at any time owned by any protected person, or operated by or for any protected person;
- the nuclear material is contained in spent nuclear fuel, or nuclear waste, that is or was at any time possessed, handled, used, processed, stored, transported, or disposed of by or for any protected person; or
- the bodily injury or property damage results from the furnishing by any protected person of services, materials, parts, or equipment in connection with the planning, construction, maintenance, operation, or use of a nuclear facility. However, we'll apply this exclusion part only to property damage to the nuclear facility, and any property located on the site of that facility, if the nuclear facility is in the United States of America, its territories or possessions, Puerto Rico, or Canada.

*Nuclear energy liability insurance policy* means any nuclear energy liability insurance policy issued by any of the following organizations or their successors:

- Nuclear Energy Liability Insurance Association.
- Mutual Atomic Energy Liability Underwriters.
- Nuclear Insurance Association of Canada.

*Hazardous properties* includes radioactive, toxic, or explosive properties.

*Nuclear material* means any of the following materials defined in the federal Atomic Energy Act or any of its amendments:

- Source material.
- Special nuclear material.
- By-product material.

*Nuclear facility* means any:

- nuclear reactor;
- uranium isotopes separation device or equipment;
- special nuclear material device or equipment; or
- nuclear waste site.

Nuclear facility includes:

- the site on which it's located;
- all operations conducted on such site; and
- all premises used for such operations.

*Nuclear reactor* means any device, equipment, or machine designed or used to:

- sustain nuclear fission in a self-supporting chain reaction; or
- contain a critical mass of fissionable material.

*Uranium isotopes separation device or equipment* means any device or equipment designed or used for:

- separating the isotopes of uranium or plutonium;
- processing or utilizing spent nuclear fuel; or
- handling, processing, or packaging nuclear waste.

*Special nuclear material device or equipment* means any device or equipment used for the processing, fabricating, or alloying of special nuclear material if the total amount of such material is at any time in the custody of any protected person at the premises where the device or equipment is located and is more than:

- 25 grams of plutonium or uranium 233, or any combination of those two materials; or
- 250 grams of uranium 235.

*Nuclear waste site* means any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of nuclear waste.

*Nuclear waste* means any waste material that:

- contains by-product material; and
- results from the operation of any nuclear reactor, or uranium isotopes separation

---

Exhibit ___A___

Page ___62___

The St.Paul

device or equipment, by any person or organization.

But we won't consider nuclear waste to include tailings or wastes that result from the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content.

*Spent nuclear fuel* means any solid or liquid fuel element or component that's been exposed to radiation or used in a nuclear reactor.

**Pollution injury or damage.** We won't cover injury or damage or medical expenses that result from pollution at, on, in, or from any:

* protected person's premises;
* waste site; or
* protected person's work site.

Nor will we cover injury or damage or medical expenses that result from pollution involving any waste pollutant.

But we won't apply this exclusion to bodily injury, property damage, or medical expenses that result from:

* building heating equipment fumes, smoke, soot, or vapors;
* contractor or service work materials fumes, gases, or vapors;
* hostile fire heat, fumes, or smoke; or
* mobile equipment operating fluids.

Nor will we apply this exclusion to:

* bodily injury or property damage that results from your products or your completed work, other than waste products or completed work; or
* premises damage that results from fire.

*Pollution* means any actual, alleged, or threatened discharge, dispersal, escape, migration, release, or seepage of any pollutant.

*Pollutant* means any solid, liquid, gaseous, or thermal irritant or contaminant, including:

* smoke, vapors, soot, fumes;
* acids, alkalis, chemicals; and
* waste.

*Waste* includes materials to be recycled, reconditioned, or reclaimed.

*Protected person's premises* means any premises, site, or location that is or was at any time owned, rented, leased, borrowed, or occupied by any protected person. For example:

*You sold an office building two years ago. It contains asbestos ceiling tile that released asbestos into the air while you owned it. A former tenant now sues you for bodily injury that allegedly resulted from the release of that asbestos. We won't cover such injury.*

Another example:

*You own an apartment building. Its woodwork is finished with paint that contains lead. Two of your renters sue you for bodily injury to their children allegedly caused by the lead in that paint. The children supposedly consumed the lead by eating chips of the paint from the window sills in their apartments. We won't cover such injury.*

But we won't consider a premises, site, or location that isn't owned, rented, leased, borrowed, or occupied by you to be a protected person's premises in connection with pollution that results from your work being performed there. For example:

*You are hired by the owner of a premises to perform work there. The premises owner requires you to provide it with insurance protection for that work. We do so with an additional protected person endorsement under this agreement. Your work being performed on that premises causes pollution injury or damage to happen there. Even though that premises is owned by an additional protected person, we won't consider that premises to be a protected person's premises for purposes of determining your coverage, or the premises owner's coverage, for that injury or damage under this agreement.*

*Waste site* means any premises, site, or location that is or was at any time used by or for any protected person or others for

---

Exhibit ___A___

Page ___103___

The St.Paul

the handling, storage, disposal, processing, or treatment of waste. For example:

*For several years waste generated by your manufacturing business was disposed of in a landfill owned by others. The landfill was closed two years ago. Nearby residents now allege that they're being injured by the waste from there. We won't cover such injury.*

*Protected person's work site* means any premises, site, or location at, on, or in which work is being performed by or for any protected person when:

- the pollution involves a pollutant that is brought to, on, or in such premises, site, or location by or for the protected person in connection with such work; or
- the work being performed is pollution work.

For example:

*A subcontractor working for you brings a diesel fuel storage tank to the building site for refueling of its excavation equipment. After a couple of days it is discovered that the tank has been leaking. Some of the escaped fuel is found to have seeped into an underground conduit and damaged the insulation on the fiber optic cables in the conduit. We won't cover such property damage.*

*Waste pollutant* means any pollutant that is or was at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

- any protected person; or
- any person or organization for whom you may be legally responsible.

For example:

*Waste generated by your business is transported to a landfill by a trucker hired by you. There is an accident that causes the waste to be spilled onto the road. One of the firefighters who responds to the accident later alleges that fumes from the waste made her ill. We won't cover such injury.*

*Building heating equipment fumes, smoke, soot, or vapors* means only the fumes, smoke, soot, or vapors that:

- result from equipment used to heat a building at or on a protected person's premises; and
- are within that building.

*Contractor or service work materials fumes, gases, or vapors* means only the fumes, gases, or vapors that:

- result from materials brought into a building at or on a protected person's work site in connection with work, other than pollution work, being performed there by or for you; and
- are within that building.

*Hostile fire heat, fumes, or smoke* means only the heat, fumes, or smoke that result from a hostile fire at, on, in, or from:

- the protected person's premises, other than a waste site; or
- the protected person's work site, other than a waste site, but only if the hostile fire doesn't result from pollution work being performed by or for the protected person.

*Hostile fire* means a fire that:

- becomes uncontrollable; or
- breaks out from where it was intended to be.

*Mobile equipment operating fluids* means only the fuels, lubricants, or other operating fluids that:

- are part of the mobile equipment being maintained, operated, or used in connection with work, other than pollution work, being performed by or for the protected person at, on, or in the protected person's work site;
- are needed to perform the normal electrical, hydraulic, or mechanical functions necessary for the operation of the mobile equipment or any of its parts;
- aren't intended to be discharged, dispersed, or released as part of the operation of the mobile equipment or any of its parts;
- aren't intended to be discharged, dispersed, or released as part of the work being performed by or for the protected person; and

---

Exhibit _____ A

Page _____ 104

The St Paul

escape from a mobile equipment part designed to hold, store, or receive them.

*Waste products or completed work* means:

- your products, or your completed work, that is or was handled, stored, disposed of, processed, or treated as waste at, on, or in a waste site; or
- your products, or your completed work, that is or was a waste pollutant; or
- your completed work that is being used for cleaning up, containing, detoxifying, disposal of, handling, monitoring, neutralizing, processing, removing, storing, testing for, transporting, or treating any pollutant at, on, or in a waste site.

We explain the terms:

- mobile equipment in the Mobile equipment exclusion;
- pollution work in the Pollution work loss, cost, or expense exclusion;
- premises damage in the Each event limit section; and
- your products, your work, and your completed work in the Products and completed work total limit section.

**Pollution work loss, cost, or expense.** We won't cover any loss, cost, or expense that results from:

- any request, demand, order, or statutory or regulatory requirement that any protected person or others perform pollution work; or
- any claim or suit by or for any governmental authority for damages that result from the performance of pollution work.

But we won't apply this exclusion to any damages for property damage for which the protected person would have liability without such:

- request, demand, order, or statutory or regulatory requirement; or
- claim or suit.

For example:

*One of your products is a container that may be used to store various types of liquids. Several of those containers are sold to a company that uses them for storage of a chemical in one of its*

*warehouses. During such use one of them ruptures and the chemical spills onto a concrete floor. Some of the spilled chemical seeps into the ground through a gap between the floor and an adjoining wall.*

*The customer alleges that the corrosive effect of the spilled chemical caused parts of the concrete floor to disintegrate, making them unusable. As a result, he demands that you pay the cost to replace those parts of the floor and properly dispose of any contaminated concrete.*

*Also, the customer is concerned that the spilled chemical that seeped into the ground may be considered a source of pollution by adjacent property owners or by a state environmental protection law. As a result, he also demands that you pay the cost to replace and properly dispose of any contaminated soil.*

*Based on the facts available to us, we'll consider the cost to replace the disintegrated parts of the concrete floor to be damages for property damage that isn't subject to this exclusion. However, we won't cover:*

- *the additional cost to properly dispose of any contaminated concrete; or*
- *the cost to replace or properly dispose of any contaminated soil;*

*regardless of who demands or requires that such pollution work be done.*

*Pollution work* means:

- the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing of any pollutant; or
- the responding to, or assessing, in any way the effects of any pollutant.

For example:

*A chemical spill at your manufacturing facility releases a vapor cloud. Several hundred people are exposed to the vapor cloud before it disappears. None of them sustain any apparent bodily injury. However, several of them demand that you arrange and pay for medical checkups now, and yearly for the next ten years, to assess*

---

©St.Paul Fire and Marine Insurance Co. 2001 All Rights Reserved

Exhibit _____A_____

Page _____105_____

The St.Paul

*the effect of the vapor cloud on their health. We won't cover the cost of such pollution work, regardless of who orders or performs it.*

We explain the terms:

- pollutant in the Pollution injury or damage exclusion; and
- your products in the Products and completed work total limit section.

**Poor quality or performance.** We won't cover advertising injury that results from the failure of your products, your work, or your completed work to conform with advertised quality or performance.

We explain the terms your products, your work, and your completed work in the Products and completed work total limit section.

**Product recall.** We won't cover any loss, cost, or expense that is incurred by you or others and results from any recall, removal, or withdrawal of:

- impaired property;
- your products; or
- your completed work;

from the market, or from use by any person or organization, for any reason.

Nor will we cover any loss, cost, or expense that is incurred by you or others and results from the:

- loss of use;
- adjustment, inspection, repair;
- replacement; or
- disposal;

of such property, products, or completed work.

We explain the terms:

- impaired property in the Impaired property exclusion; and
- your products and your completed work in the Products and completed work total limit section.

**Unnamed partnership, joint venture, or limited liability company.** We won't cover injury or damage or medical expenses that result from the conduct of any current or past partnership, joint venture, or limited liability

company that isn't shown in the Introduction as a named insured.

But we won't apply this exclusion to the extent such organization otherwise qualifies as a protected person under the Who Is Protected Under This Agreement section.

**Watercraft.** We won't cover bodily injury, property damage, or medical expenses that result from the:

- ownership, maintenance, use, or operation;
- loading or unloading;
- entrustment to others; or
- supervision of others in or for the maintenance, use, operation, loading or unloading, or entrustment to others;

of any watercraft owned, operated, rented, leased, or borrowed by any protected person.

But we won't apply this exclusion to the liability of another to pay damages for bodily injury or property damage if you have assumed such liability under a covered contract that:

- is for the ownership, maintenance, or use of a watercraft; and
- was made before the bodily injury or property damage happens.

Nor will we apply this exclusion to premises damage.

Also, we won't apply this exclusion to bodily injury, property damage, or medical expenses that result from:

- watercraft while ashore on premises that you rent or lease from others, or own;
- watercraft you don't own that is less than 75 feet long and isn't being used to carry persons or property for a charge; or
- the operation of specialized equipment.

We explain the terms:

- covered contract in the Contract liability exclusion;
- entrustment to others, loading or unloading, and supervision of others, in the Auto exclusion;
- premises damage in the Each event limit section; and
- specialized equipment in the Mobile equipment exclusion.

---

Exhibit _A_

Page _lolo_

The St.Paul

**Workers compensation and other benefits laws.**
We won't cover any obligation that the
protected person has under any:

• workers compensation law;

• disability benefits law;

• unemployment compensation law; or

• similar law.

**Wrong price description.** We won't cover
advertising injury that results from the
wrong description of the price of your
products, your work, or your completed
work.

We explain the terms your products, your
work, and your completed work in the
Products and completed work total limit
section.

## Other Insurance

This agreement is primary insurance.  If
there is any valid and collectible other
insurance for injury or damage covered by
this agreement, the following applies in
connection with that other insurance:

*Other insurance* means insurance, or the
funding of losses, that's provided by or
through:

• another insurance company;

• us, except under this agreement;

• any of our affiliated insurance companies;

• any risk retention group;

• any self-insurance method or program,
other than any funded by you and over
which this agreement applies; or

• any similar risk transfer or risk
management method.

However, we won't consider umbrella
insurance, or excess insurance, that you
bought specifically to apply in excess of the
limits of coverage that apply under this
agreement to be other insurance.

**Primary or excess other insurance.** When there
is primary other insurance, we'll share with
that other insurance any damages for injury
or damage covered by this agreement. We'll
do so with one of the methods of sharing
described in the Methods of sharing section.

However, we'll apply this agreement as
excess insurance over the part or parts of
any primary or excess other insurance that
provide:

• property or similar coverage for property
damage to your work;

• property or similar coverage for property
damage to premises that you rent, lease,
or borrow from others, other than
premises you rent for a period of seven
or fewer consecutive days;

• aircraft, auto, or watercraft bodily injury
or property damage coverage; or

• protection for you as an additional insured
or additional protected person.

We explain how we'll apply this agreement
as excess insurance in the When this
agreement is excess insurance section.

*Aircraft, auto, or watercraft bodily injury
or property damage coverage* means
coverage for bodily injury or property
damage that:

• results from the maintenance, use,
operation, or loading or unloading of any
aircraft, auto, or watercraft; and

• isn't specifically excluded by the Aircraft,
Auto, or Watercraft exclusions in this
agreement.

We explain the term your work in the
Products and completed work total limit
section.

**When this agreement is excess insurance.**
When this agreement is excess insurance, we
won't have a duty to defend the protected
person against the part or parts of any
claim or suit for which any other insurer has
the duty to defend that protected person.

However, we'll defend the protected person
against a claim or suit for injury or damage
covered by this agreement if no other
insurer will do so.  In return we'll require
that we be given all of that protected
person's rights against each such insurer.

Also, we'll pay only the amount of damages
that's in excess of:

• the total amount that all such other
insurance would pay if this agreement
didn't exist; and

• the total of all deductible and self-insured
amounts under all such other insurance.

Exhibit _A_

Page _107_

The St Paul

But we won't pay more than the limits of coverage that apply under this agreement.

**Methods of sharing.** We'll use one of the methods of sharing described below.

*Contribution by equal shares.* If all of the other insurance permits contribution by equal shares, we'll share the damages equally. But we won't pay more than the limits of coverage that apply under this agreement. If any policy reaches its limit before the entire amount of damages is paid, the remaining policies will share the balance equally until their limits have been used up or the amount of the damages is paid in full. For example:

*You are required by a court to pay damages of $1,000,000. Besides this agreement, two other policies apply to the judgment. The limit under this agreement is $500,000. Policy B has a $100,000 limit and Policy C's limit is $300,000.*

*First, $100,000 is subtracted from each policy's limit because that is the lowest limit provided by any of the three policies. The result is Policy B's limit is used up, the balance due on the judgment is $700,000, $400,000 remains of this agreement's limit, and the unused portion of Policy C's limit equals $200,000.*

*Next, $200,000 is subtracted from the limit under this agreement and Policy C because that amount equals the smallest amount of limit remaining on either policy*

*after the initial $100,000 payment. The result is Policy C's limit is used up, the balance due on the judgment is now $300,000, and this agreement has $200,000 of its limit remaining.*

*Finally, the rest of the limit under this agreement is paid. The result is this agreement's limit is used up and the balance due on the judgment is now $100,000, which you must pay. The total paid under each policy is $500,000 this agreement, $100,000 Policy B, and $300,000 Policy C.*

*Contribution by limits.* If any of the other insurance doesn't permit contribution by equal shares, we'll pay the portion of the damages that is equal to our percentage of the total of all limits that apply. But we won't pay more than the limits of coverage that apply under this agreement. For example:

*You are required by a court to pay damages of $600,000. Besides this agreement, another policy applies to the judgment. The limit under this agreement is $300,000. Policy B has a $100,000 limit. The total limit of all insurance is $400,000.*

*Our limit is 75% ($300,000/$400,000) of the total limit. But we won't pay 75% of the judgment because that $450,000 share is more than our limit. We'll pay only our limit, which is $300,000.*

Exhibit _A_

Page _68_

CALIFORNIA REQUIRED ENDORSEMENT                                    The **StPaul**

This endorsement changes your policy to
comply with California law.

---

## Cancellation

The Cancellation section of the General
Rules is replaced by the following.

You can cancel this policy in whole or in
part at any time.

**How you can cancel.** To cancel this policy or
any of its insuring agreements, you must
deliver the policy, or the part you want
canceled, to us or to any of our authorized
agents. If this isn't possible, notify us by
mail and include the date you want the
policy or individual insuring agreement
canceled. You'll get a refund for the unused
premium, less a charge for early
cancellation.

**How we can cancel policies in effect 60 days
or less.** If your policy has been in effect
60 days or less, and is not a renewal or
continuous policy, we can cancel for any
reason during this period. If we do, we'll
mail or deliver a notice of cancellation to
the first named insured. If we're canceling
because of nonpayment of premium or
because we discovered that any person
insured by this policy has committed fraud
or made a material misrepresentation either
in obtaining this policy or in submitting a
claim under this policy, we'll send notice at
least 10 days before coverage will end. If
we're canceling for any other reason we'll
send notice at least 30 days before
coverage will end. The notice will state the
reason for cancellation.

**How we can cancel policies in effect more than
60 days.** If your policy has been in effect
more than 60 days, or is a continuous or
renewal policy, we can cancel only for the
following reasons:

1. *Nonpayment of premium.* We can cancel
   if the first named insured fails to pay
   any premium or premium installment
   when due. This includes any installment
   of premium that was from a previous

policy we issued that was due during the
current policy period.

2. *Fraud or misrepresentation.* We can
   cancel if we discover that any person
   insured by this policy has committed
   fraud or made a material
   misrepresentation, either in obtaining this
   policy or in submitting a claim under this
   policy.

3. *Conviction of a crime.* We can cancel if
   you are convicted of a crime that
   increases any hazard you're insured
   against.

4. *Negligent acts.* We can cancel if we
   discover that you have committed a
   willful or extremely negligent act or
   omission that increases any hazard you're
   insured against.

5. *Failure to follow loss control
   requirements.* We may cancel if you or
   your representative fail to follow
   reasonable loss control requirements that
   you agreed to follow in order for us to
   issue your policy or give you certain
   premium rates.

6. *Determination by the Insurance
   Commissioner.* We can cancel this policy
   if the Commissioner Of Insurance
   determines that continuing this policy
   would put us in violation of California
   insurance laws, or jeopardize our being
   solvent. We can also cancel if the
   Insurance Commissioner determines that
   any loss of or change in our reinsurance
   affecting this policy would threaten our
   financial position.

7. *Change in the risk.* We can cancel if,
   after we have issued or renewed your
   policy, a change occurs in the risk we're
   protecting that increases the hazard we're
   insuring against. But this doesn't apply
   to a change that was expected or
   foreseen by us when we issued your
   policy.

---

Exhibit _____A_____

Page _____109_____

The**St.Paul**

If we cancel for nonpayment of premium or fraud or misrepresentation as described above, we'll mail a cancellation notice at least 10 days before coverage will end. If we cancel for any other reason, we'll mail or deliver the notice to the first named insured and the agent who sold this policy at least 30 days before coverage will end. The notice will state the exact reason for cancellation.

**Nonrenewal.**  If we decide not to renew or continue this policy, we'll mail a notice to the first named insured at least 60 days but not more than 120 days before the end of the policy period.  The notice will show the reason for nonrenewal.

If state law requires us to give additional notices or changes our notice requirements, we will provide such additional notices or changes as needed.

If we offer to renew or continue your policy and you don't accept, the policy will expire at the end of the policy period.  If we offer to renew your policy, and you fail to pay the required premium when due, we'll consider this to mean that you don't accept our offer.

If we fail to send proper notice of nonrenewal and you obtain other insurance, this policy will end on the date the other insurance takes effect.

**Mailing the notice.**   Mailing the cancellation or nonrenewal notice to the first named insured's and agent's last address known to us will be considered proof you were notified.

### Fraud And Misrepresentation

If your policy includes property or inland marine insurance, the following replaces the Fraud And Misrepresentation section of the General Rules to the extent that section applies to any property or inland marine insuring agreement that's part of your policy.

For loss or damage caused by fire, we won't provide coverage to the protected person if, before or after the loss or damage, that protected person has committed fraud or intentionally concealed or misrepresented any material fact or circumstance concerning:

* this insuring agreement;
* the covered property;
* that protected person's interest in the covered property; or
* a claim under this insuring agreement.

For loss or damage caused by a covered cause of loss other than fire, this insuring agreement is void if, before or after the loss or damage, any protected person has committed fraud or intentionally concealed or misrepresented any material fact or circumstance concerning:

* this insuring agreement;
* the covered property;
* a protected person's interest in the covered property; or
* a claim under this insuring agreement.

### Actual Cash Value

If your policy includes property or inland marine insurance, the following is added to any insuring agreement that uses the term actual cash value.

We'll figure actual cash value as the amount it would cost to repair or replace covered property at the time of loss or damage with material of like kind and quality, less an amount for deterioration, depreciation, or obsolescence.

Actual cash value applies to valuation of covered property regardless of whether that property has sustained partial or total loss or damage.

The actual cash value of the lost or damaged property may be significantly less than its replacement cost.

### Other Terms

All other terms of your policy remain the same.

Exhibit _A_

Page ___70___

**DESCRIBED OPERATIONS LIMITATION ENDORSEMENT**

The **St.Paul**

This endorsement changes your Commercial General Liability Protection

---

**How Coverage Is Changed**

The following is added to the Exclusions – What This Agreement Won't Cover section. This change reduces coverage.

**Described Operations.** We won't cover injury or damage that results from your work, products, or completed work in the following types of operations.

Nor will we cover medical expenses or premises damage that result from such operations.

We explain what we mean by your work, your products, and your completed work in the Products and completed work total limit section.

**Described Operations:**

1. Circus and Carnivals

2. Mechanical Amusement Devices

3. Motorized Sporting Events

4. Tractor/Truck Pulls

5. Boxing, Wrestling, Hockey and Contact Karate Events

6. Rodeos and Roping Events (including practice)

7. Aircraft and Balloon Events

8. Professional Sporting Activities

9. Rap and/or Heavy Metal Concerts

However, we won't apply this exclusion to the operation described in the Coverage Summary.

**Other Terms**

All other terms of your policy remain the same.

---

L0081 Ed. 12-97   Printed in U.S.A.        Endorsement                    Page 1 of 1
©St.Paul Fire and Marine Insurance Co.1997 All Rights Reserved

Exhibit _A_
Page _71_

ENTERTAINERS LIABILITY LIMITATION ENDORSEMENT

The**StPaul**

This endorsement changes your Commercial
General Liability Protection.

## How Coverage Is Changed

The following exclusions are added to the
Exclusion - What This Agreement Won't
Cover section.  This change reduces
coverage..

**Promoting activities.**  We won't cover injury or
damage that results from promoting
activities by you or any protected person.

However, we won't apply this exclusion to
the promoting activities described in the
Coverage Summary.

**Pyrotechnics and explosives.**  We won't cover
bodily injury or property damage that results
from the use of any explosives, fireworks,
or pyrotechnic devices.  But this exclusion
won't apply to flashboxes.

Nor will we cover any resulting medical
expenses or premises damages.

However, we won't apply this exclusion to
the pyrotechnics and explosives devices
described in the Coverage Summary.

*Flashbox* means a devise that's used in
shows to create a visual effect along with
an explosive noise.  It's induced electrically
in a cylinder with no projectile, wadding, or
wrapping.

**Throwing objects.**  We won't cover bodily
injury or property damage caused by you or
any protected person intentionally throwing
objects of any kind toward an audience or
any other members of the public during any
performance or rehearsal.

Nor will we cover any resulting medical
expenses that result from from such injury.

However, we won't apply this exclusion to
the throwing of object described in the
Coverage Summary.

## Other Terms

All other terms of your policy remain the
same.

Exhibit _A_
Page _72_

## FIELD OF ENTERTAINMENT LIMITATION ENDORSEMENT

The **StPaul**

This endorsement changes your Commercial General Liability Protection.

### How Coverage Is Changed

The following is added to the Exclusions - What This Agreement Won't Cover section. This change reduces coverage.

**Field of Entertainment.** We won't cover personal injury or advertising injury that results from the content of, or the advertising or publicizing for, any Properties or Programs which are within your Field of Entertainment Business.

We explain what we mean by personal injury and advertising injury in the What This Agreement Covers section.

*Properties or Programs* means any of your properties, products, programs, materials or other matter.

*Field of Entertainment Business* includes the following:

- The creation, production, publication, distribution, exploitation, exhibition, advertising and publicizing of product or material in any and all media such as motion pictures of any kind and character, television programs, commercials or industrial or educational or training films, phonograph records, audio or video tapes, CDs or CD ROMs, computer on-line services or internet or Web site pages, cassettes or discs, electrical transcriptions, music in sheet or other form, live performance, books and other publications.
- The ownership, operation, maintenance or use of radio and television broadcasting stations, CATV systems, cinemas, stage productions with living actors, and any similar exhibition or broadcast media.
- The ownership, operation maintenance or use of merchandising programs, advertising or publicity material, characters or ideas; whether or not on your premises or in your possession at the time of the alleged offense.

### Other Terms

All other terms of your policy remain the same.

Exhibit ___A___

Page ___73___